USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1937 UNITED STATES, Appellee, v. BENIGNO SANTIAGO-BECERRIL, a/k/a BENNY, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO [Hon. Hector M. Laffitte, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Lagueux,* Chief District Judge. ____________________ ____________________ Jorge L. Arroyo-Alejandro with whom Rachel Brill were on brief __________________________ ____________ for appellant. W. Stephen Muldrow, Assistant United States Attorney, with whom ___________________ Nelson Perez-Sosa, Assistant United States Attorney, and Jose A. __________________ _______ Quiles-Espinosa, Senior Litigation Counsel, were on brief for the _______________ United States. ____________________ November 20, 1997 ____________________  ____________________ *Of the District of Rhode Island, sitting by designation. CAMPBELL, Senior Circuit Judge. Defendant- _______________________ appellant Benigno Santiago-Becerril ("Santiago") appeals from convictions for the wrongful taking of a motor vehicle by force and violence, with a resulting death, see 18 U.S.C.  ___ 2119(3) (Supp. 1997), 2 (1969), and for the knowing use of a firearm in relation to a crime of violence, see 18 U.S.C.  ___ 924(c)(1) & (3) (Supp. 1997), 2 (1969). He argues on appeal that the district court violated his statutory and constitutional rights to a speedy trial, as well as his constitutional right to present witnesses in his own defense. I. I. Santiago was arrested on October 20, 1994 pursuant to a warrant issued after a criminal complaint had been filed against him on the previous day. He has since been incarcerated. Criminal complaints and arrest warrants were also issued on October 20, 1994 against two minors, Antonio Jose Esquilin-Garcia ("Esquilin") and Pedro Antonio Ramos-Rosa ("Ramos"), alleged to have participated in the same offense as Santiago. Both were arrested on November 11, 1994. Because Esquilin and Ramos were minors, only Santiago was charged in an indictment returned on November 2, 1994. At his arraignment on November 9, 1994, Santiago pled not guilty to both counts of the indictment. -2- 2 On November 22, 1994, Santiago filed a motion to continue his trial, which had been scheduled for January 12, 1995. As a reason for the continuance, Santiago's counsel stated that he (counsel) would be on trial at the time in another case. The district court granted the continuance on December 1, 1994, finding that Santiago's interest in being represented by competent counsel outweighed his interests in a speedy trial and ordering counsel for Santiago to notify the court when the other trial had ended. On February 2, 1995, Santiago's counsel notified the district court that his other trial was over, allowing the setting of a new trial date. On March 1, 1995, the district court ordered a pretrial conference on March 6, 1995, and set Santiago's trial for March 13, 1995. On March 10, 1995, the government requested a continuance of the March 13 trial date, stating that Esquilin and Ramos were both awaiting a hearing on a motion to transfer to adult status. If the transfers were allowed, the government proposed to try them along with Santiago. Without objection, the district court allowed the continuance on March 13, 1995. The court found the ends of justice were served by continuing the trial, and that the ability to try together all persons implicated in this case outweighed the interests in a speedy trial. -3- 3 On October 10, 1995, the district court ordered that both Esquilin and Ramos be transferred to adult status. On October 18, 1995, the grand jury returned a superseding indictment, charging the two transferred minors and Santiago with the same offenses charged in the original indictment against Santiago alone.  On December 4, 1995, Ramos entered a plea of guilty as to counts one and two of the superseding indictment pursuant to a Plea and Cooperation Agreement. On January 22, 1996, Esquilin did the same in respect to count one of the superseding indictment. Santiago's trial was set for January 23, 1996. On January 18, 1996, Santiago filed a motion to dismiss the superseding indictment for violation of his constitutional and statutory rights to a speedy trial. Five days later, following argument, the district court ruled to deny Santiago's motion to dismiss. Trial began, as scheduled, on January 23, 1995. On the fifth day of trial, the defense called Wanda Caceres ("Caceres"), Santiago's stepmother, to the witness stand. Before she could testify, the court required the defense to make a proffer of her expected testimony. Counsel represented that Caceres would testify about her post-offense conversations with the defendants and about her efforts to purchase airline tickets for them to travel to the mainland. -4- 4 After the proffer, the district court warned Caceres about her right to refuse to testify, because of the possibility that she might incriminate herself. The court also appointed an attorney to advise Caceres, who was unrepresented to that point. After Caceres s lawyer explained "her rights and the possible or probable consequences of testifying," Caceres decided not to testify. Later that same day, the jury returned a verdict, finding Santiago guilty on counts one and two of the superseding indictment.  On May 23, 1996, the district court sentenced Santiago to life imprisonment on count one and, consecutively, to sixty months' imprisonment on count two. Santiago appealed. II. II. A. Santiago's Statutory and Constitutional Rights to a Santiago's Statutory and Constitutional Rights to a Speedy Trial Speedy Trial 1. The Statutory Right ___________________ The Speedy Trial Act ("STA"), 18 U.S.C. 3161 et __ seq. (1985), is designed "to protect a defendant's ___ constitutional right to a speedy . . . trial, and to serve the public interest in bringing prompt criminal proceedings." United States v. Saltzman, 984 F.2d 1087, 1090 (10th Cir. _____________ ________ 1993) (citing United States v. Noone, 913 F.2d 20, 28 (1st _____________ _____ Cir. 1990)). The STA provides that the government must bring a criminal defendant to trial no more than seventy days after -5- 5 the later of the filing date of the information or indictment or the date on which the criminal defendant first appears before a judicial officer of the court in which the charge is pending. 18 U.S.C. 3161(c)(1) (1985); see also United ___ ____ ______ States v. Torres Lopez, 851 F.2d 520, 525 (1st Cir. 1988). ______ ____________ In calculating the seventy days the STA excludes certain time periods. See 18 U.S.C. 3161(h)(1)-(9) (1985); see also ___ ___ ____ United States v. Sposito, 106 F.3d 1042, 1043 (1st Cir. ______________ _______ 1997); United States v. Thurlow, 710 F. Supp. 380, 381 (D. ______________ _______ Me. 1989). If a criminal defendant is not brought to trial within the seventy-day time limit required by 3161(c)(1), as extended by operation of 3161(h)(1)-(9), the penalty provisions of the STA mandate that "the information or indictment shall be dismissed on motion of the defendant." 18 U.S.C. 3162(a)(2) (1985); see also Sposito, 106 F.3d at ___ ____ _______ 1043; Thurlow, 710 F. Supp. at 381. _______ Santiago argues that the district court erred in denying his motion to dismiss the superseding indictment. He says that the delay in his being brought to trial added up to twice the number of statutorily allowable days. In response, the government asserts that only forty-nine non-excludable days passed before Santiago was brought to trial.  We find no error in the district court's refusal to dismiss the superseding indictment. This court reviews the disposition of a STA issue for clear error as to factual -6- 6 findings and de novo as to legal rulings. See United States __ ____ ___ ______________ v. Rodriguez, 63 F.3d 1159, 1162 (1st Cir. 1995). We _________ conclude that fewer than seventy non-excludable days went by before Santiago was brought to trial. a) November 4, 1994 to March 1, 1995 (Santiago's ______________________________________________ motion for a continuance of trial) __________________________________ The original indictment was returned on November 2, 1994. Santiago first appeared before a judicial officer of the district court on November 4, 1994. STA calculation begins with the latter of these two dates. See 18 U.S.C.  ___ 3161(c)(1) (1985). November 4, 1994 is itself excludable because Santiago appeared before the district court on that day. See ___ 18 U.S.C. 3161(h)(1) (1985) ("proceedings concerning the defendant"). That day is also excludable for another reason, to wit, the government's motion to detain Santiago without bail pending the detention hearing, which the court granted that same day. See 18 U.S.C. 3161(h)(1)(F) (1985). ___ Section 3161(h)(1)(F) excludes any "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." Id. November 9, 1994 is excludable because of ___ Santiago's arraignment and detention hearing on that day. See 18 U.S.C. 3161(h)(1) (1985). ___ Santiago contends that the period from November 10, 1994 up to and including November 21, 1994 is non-excludable. -7- 7 The government agrees. We therefore find a total of sixteen non-excludable days up to this point. On November 22, 1994, Santiago filed a motion notifying the district court of his counsel's unavailability on January 12, 1995, the scheduled trial date, because of another trial. Santiago requested an indefinite continuance of the trial as set for January 12, 1995. The court granted this motion ten days later, on December 1, 1994, ordering counsel to notify the court when the other trial was over. The parties agree that the ten days the court took to decide the motion were excludable from the STA's seventy-day time limit. See 18 U.S.C. 3161(h)(1)(F) (1985). They likewise ___ agree that December 2, 1994 was excludable, a pretrial conference being held on that day. See 18 U.S.C.  ___ 3161(h)(1) (1985). Santiago asserts that the six days from December 3, 1994 to December 8, 1994 are non-excludable. The government contends that the indefinite continuance of the trial, granted at defendant's request on December 1, 1994, makes these days excludable. The STA excludes any period of delay resulting from the court's granting of a continuance if the continuance was granted on the basis of findings that the ends of justice served outweigh the speedy trial interest. See 18 U.S.C.  ___ -8- 8 3161(h)(8)(A) (1985).1 An ends of justice continuance was granted here. Santiago contends, however, that the excludable time attributable to the continuance must be limited to the period of time between January 12, 1995, the original trial date, and February 2, 1995, the date defense counsel notified the court of his availability for trial. The government maintains that the entire three month period of time starting on December 1, 1994, the date the court continued the original trial date, and ending on March 1, 1995, the day the court set a new trial date, is excludable from the STA's seventy-day time limit. We agree with the government. The "period of delay" resulting from the continuance began on December 1, 1994, when the January 12, 1995, trial date was canceled and the trial put on hold until further order. The period of delay remained in effect from then through March 1, 1995,  ____________________ 1. Section 3161(h)(8)(A) provides, in pertinent part, as follows: (h) The following periods of delay shall be excluded in computing the time . . . within which the trial . . . must commence: (8)(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. 18 U.S.C. 3161(h)(8)(A) (1985).  -9- 9 when, after having been earlier advised of counsel's availability, the court set a new trial date. There is no way to regard the period from the court's December 1 ruling to the original January 12 trial date as if no continuance were then in effect. The continuance ruled out all possibility of a trial while it lasted, relieving the parties of the need to prepare for trial on January 12, as previously scheduled, or at any time from December 1 until a new trial date was set. Contending that a continuance of trial ends when the reason for it ends, Santiago argues that the twenty-seven day period beginning on February 2, 1995 and ending on March 1, 1995, during which the court was aware of defense counsel's availability but had not yet set a new trial date, cannot be excludable. To exclude that period, Santiago asserts, citing to United States v. Rush, 738 F.2d 497, 505- _____________ ____ 06 (1st Cir. 1984), would give rise to an automatic additional period of exclusion after every "ends of justice" continuance between the notice that the event triggering the continuance of trial has ended and the court's order setting a new trial date. Santiago argues that his counsel's February 2, 1995 notice of availability left nothing for the district court to do but set a new trial date, a routine act. We do not accept Santiago's argument. The "period of delay" caused by the ends of justice continuance included -10- 10 the time, following counsel's notice of readiness, that the judge reasonably required to schedule a new trial date. The mere announcement of counsel's availability did not automatically terminate the continuance of the trial. Setting a new date required consideration of the court's calendar; an available window had to be found. The court may not have been able to determine as soon as counsel s availability was known when its other obligations would allow the scheduling of a trial. The court took less than a month to schedule a new trial date, which was not an unreasonable delay. We add that the twenty-seven days that elapsed before a new trial date was set can be viewed as separately excludable under the provisions of 3161(h)(1)(F), which excludes the time pending disposition of a motion. By notifying the court of his availability for trial, defense counsel may be said to have impliedly moved for a new trial date. The court acted on the implied motion on March 1, 1995 by setting a new trial date of March 13, 1995. Motions that do not require a hearing may toll the seventy-day time limit for up to thirty days. See Henderson v. United States, 476 ___ _________ _____________ U.S. 321, 29 (1986) (noting that the phrase "prompt disposition" in 3161(h)(1)(F) so limits the amount of time that can be excluded). As already noted, the twenty-seven days taken by the court to determine a new date was -11- 11 reasonable enough. We conclude that the entire period from December 1, 1994 through March 1, 1995 was excludable for purposes of the STA, leaving us still with a total of sixteen non-excludable days at this point in time. b) March 2, 1995 to October 18, 1995 (The ______________________________________________ government's motion for a continuance of ______________________________________________ trial) ______ The new March 13 trial date did not stand for long. On March 10, 1995, the government moved to continue Santiago's trial in order to allow it to obtain permission to try the two juveniles, Ramos and Esquilin, as adults, in which event they would be eligible to be tried jointly with Santiago. Finding that the "ends of justice" would be served by continuing the trial pending resolution of Ramos's and Esquilin's adult status, the district court allowed the government's motion on March 13, 1995. The parties agree that the period of time from March 2, 1995, the day after the district court set the March 13 trial date, until March 9, 1995, the day before the government filed its motion to continue the new trial date, was non-excludable. They also agree that the days between March 10, 1995, the day the government filed its motion to continue the trial, and March 13, 1995, the day the district court granted the government's motion to continue the trial, were excludable. See 18 U.S.C. ___ 3161(h)(1)(F) (1985). The addition of the eight non- -12- 12 excludable days yields a new total of twenty-four non- excludable days. c) March 14, 1995 to October 18, 1995 __________________________________ The parties disagree sharply over exclusion of the 219-day period beginning on March 14, 1995, the day after the district court granted the government's motion to continue the trial, until October 18, 1995, the day a superseding indictment against all three defendants was returned. The March 13 continuance was open-ended, although as Santiago acknowledges, that, in and of itself, did not make it invalid. Open-ended continuances are not prohibited per se. ___ __ See United States v. Spring, 80 F.3d 1450, 1457-58 (10th Cir. ___ _____________ ______ 1996); United States v. Jones, 56 F.3d 581, 585-86 & n.10 ______________ _____ (5th Cir. 1995); United States v. Lattany, 982 F.2d 866, 868 _____________ _______ (3d Cir. 1992); Rush, 738 F.2d at 508. But see United States ____ ___ ___ _____________ v. Jordan, 915 F.2d 563, 565-66 (9th Cir. 1990) ("The Speedy ______ Trial Act . . . requires that an 'ends of justice' continuance be specifically limited in time . . . ."). This court has said, "it is generally preferable to limit a continuance to a definite period for the sake of clarity and certainty; but at the same time it is inevitable that in some cases . . . a court is forced to order an (h)(8) continuance without knowing exactly how long the reasons supporting the continuance will remain valid." Rush, 738 F.2d at 508. An ____ open-ended continuance may, therefore, bring to bear a factor -13- 13 of "reasonableness." See Lattany, 982 F.2d at 868 ("[O]pen- ___ _______ ended continuances to serve the ends of justice are not prohibited if they are reasonable in length."); Rush, 738 ____ F.2d at 508 ("It may well be that some sort of reasonableness limitation is appropriate to prevent continuances from delaying trials unfairly and circumventing the dismissal sanctions in the Speedy Trial Act . . . ."). Santiago argues that, when viewed in the totality of the circumstances, including the previous delays, the 219 day delay was clearly unreasonable. Much of that delay, he contends, was attributable to government foot-dragging and, therefore, lacked an element of defendant s involvement that has led us to exclude open-ended continuances in the past. See Lattany, 982 F.2d at 883 (holding that the length of a ___ _______ continuance was not unreasonable because of defendant's part in extending the delay). Santiago maintains that the docket entries for the transfer proceedings2 are suggestive of governmental bad faith and needless delay. He points to the postponement of a March 21, 1995 evidentiary hearing for Ramos after the government said that it had not received notice of it. Santiago contends that this delay, in addition to other questionable delays, indicate that the government was not acting expeditiously in spite of knowing that he was  ____________________ 2. Many of the records relating to the transfer proceedings do not appear in the record before us. -14- 14 still awaiting trial. And, finally, Santiago says he was misled into believing that the transfer proceedings would end momentarily.  We find little support for Santiago's charge that the transfer proceedings were protracted by governmental indifference and impropriety. Their duration does not seem extreme in the circumstances, and the continuance of Santiago s trial until it could be determined whether to try the minor codefendants with Santiago was reasonable, especially where Santiago raised no objection at the time. Cf. United States v. Parker, 404 F.2d 1193, 1196 (9th Cir. ___ ______________ ______ 1968) (noting the substantial public interest in joint trials). The two juveniles' natural resistance to being tried as adults affords an obvious explanation for the time consumed by the transfer proceedings. The seriousness of the charges provided good reason for them to do everything possible to retain their juvenile status. That the adult classification issue was not simple is suggested by the fact that, although the district judge ultimately transferred both minors to adult status, the magistrate judge presiding over the transfer proceedings recommended the transfer of only one of them. The limited record that we have reflects delays arising from, among other things, difficulties in arranging for psychological evaluations of the two juveniles. At no -15- 15 time within this period did Santiago seek either to terminate the continuance of his trial or to expedite the transfer proceedings. We conclude that the continuance for the transfer proceedings was not unreasonable or excessively long. Accordingly, we exclude the period between March 14 and October 18, 1995, pursuant to 3161(h)(8)(A). This exclusion keeps the STA count at twenty-four non-excludable days at this point in the calculations. c) October 19, 1995 to January 23, 1996 ______________________________________________ (Esquilin's motion for a change of plea) ________________________________________ The October 18, 1995 superseding indictment, which included Ramos and Esquilin as defendants along with Santiago, did not restart Santiago's STA's clock because it was based on the original charges. See United States v. ___ ______________ Rojas-Contreras, 474 U.S. 231, 240 (1985) (Blackmun, J., _______________ concurring); United States v. Karsseboom, 881 F.2d 604, 606- _____________ __________ 07 (9th Cir. 1989). The parties agree that, with the exception of October 25, 1995, the days between October 19, 1995, the day after the filing of the superseding indictment, and November 13, 1995, the day before the filing of the government's motion as to Ramos to seal documents, were non-excludable. October 25, 1995 was excludable because it was the day that Santiago was arraigned under the superseding indictment. See 18 U.S.C. 3161(h)(1) (1985). Adding these twenty-five ___ -16- 16 non-excludable days gives a new total of forty-nine non- excludable days. Because the superseding indictment pertained to all three, any defendant's motion resulting in excludable time tolled the STA clock for his codefendants. See United States ___ _____________ v. Ortiz, 23 F.3d 21, 27-28 (1st Cir. 1994); Torres Lopez, _____ ____________ 851 F.2d at 526 ("A pretrial motion resulting in excludable time for one defendant also stops the Speedy Trial clock for all codefendants." (citations omitted)); Rush, 738 F.2d at ____ 503 ("Every circuit court that has considered [ 3161(h)(7)] has held in essence that 'an exclusion applicable to one defendant applies to all codefendants.'" (citations omitted)).3 Accordingly, November 14, 1995, the date the government filed its motion to seal documents as to Ramos; November 15, 1995, the date Ramos filed his motion for a change of plea; and November 16, 1995, the date the court granted the motion to seal as to Ramos and scheduled his change of plea hearing, are all excludable from Santiago's  ____________________ 3. Section 3161(h)(7) states, in relevant part, as follows: (h) The following periods of delay shall be excluded in computing the time . . . within which the trial . . . must commence: (7) A reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted."  18 U.S.C. 3161(h)(7) (1985). -17- 17 STA computation. See 18 U.S.C. 3161(h)(1)(F), (h)(7) ___ (1985). Santiago argues that, with the exception of November 27, 1995, the period of time from November 17, 1995, the day after the court acted on the two motions, until December 3, 1995, the day before Ramos's change of plea hearing, is non-excludable. He concedes that November 27, 1995 is excludable because of the arraignment and detention hearings of Esquilin and Ramos on that date. See 18 U.S.C.  ___ 3161(h)(1)(F), (h)(7) (1985). The government, however, would exclude the entire period from November 17 through December 4, arguing that Ramos's change of plea motion was continuously under advisement until allowed at a hearing on December 4, 1995. We agree with the government, as discussed below, and exclude that period of time from the STA's seventy-day time limit. Santiago also disputes any exclusion of the period of time from December 5, 1995, the day after Ramos's change of plea hearing, through January 17, 1996, the day before the filing of Santiago's motion to dismiss the superseding indictment. Santiago contends that Esquilin's motion for change of plea, filed on December 1, 1995, was not excludable until at least December 26, 1995, when the court set January 19, 1996 as the date for Esquilin's change of plea hearing. This is so, he says, because Esquilin's motion required "no -18- 18 disposition" until December 26, (apparently because it was not yet scheduled for hearing), and because a contrary ruling would allow district judges to toll the STA clock by intentionally delaying their orders scheduling change of plea hearings. The short answer to this argument is that the exclusion provided by 3161(h)(1)(F) applies without qualification "from the filing of the motion through the conclusion of the hearing on . . . such motion," 18 U.S.C.  3161(h)(1)(F) (1985); see United States v. Jenkins, 92 F.3d ___ _____________ _______ 430, 440 (6th Cir. 1996); United States v. Mentz, 840 F.2d _____________ _____ 315, 327 n.25 (6th Cir. 1988).4 Santiago also questions the excludability of the post-December 26 period during which Esquilin's change of plea motion continued under advisement. As in the case of Ramos's similar motion, Santiago would have us deny excludability on the ground that Jenkins does not stand for _______ the proposition that the entire period from the filing of a motion for a change of plea until the change of plea hearing is excludable. The holding in Jenkins, according to _______ Santiago, dealt with a motion that did not require a hearing,  ____________________ 4. Santiago points out that the district court also excluded the period of time starting on October 18, 1995, the filing date of the superseding indictment, and ending on December 12, 1995, because of "ongoing plea negotiations." According to Santiago, this exclusion of time is contrary to both the relevant facts and the applicable law. We need not, however, consider the appropriateness of this theory, as we do not make use of it in our STA calculation and instead rely on other grounds for excluding most of this period of time. -19- 19 to wit, a motion to use a jury questionnaire.5 Santiago contends that the hearing referred to in both 3161(h)(1)(F) and the Jenkins case is one that is necessary to decide the _______ merits of the motion, and that such was not the case here. We agree with the government that all of the days between the date a codefendant files a motion for a change of plea and the date of the change of plea hearing itself are excludable from the STA's seventy-day time limit. See 18 ___ U.S.C. 3161(h)(1)(F), (h)(7) (1985); accord Jenkins, 92 ______ _______ F.3d at 440; see also Henderson, 476 U.S. at 326-27; Sposito, ___ ____ _________ _______ 106 F.3d at 1044.  A change of plea hearing is essential to establish the knowing and voluntary nature of the defendant's guilty plea, and to determine the sufficiency of its factual basis. Until these factors are established, the court may not rule definitively on whether or not to accept the motion for change of plea. Santiago argues that the district court in Thurlow _______ sets forth a better reasoned view than the one we take. Citing to 3161(h)(8)(C), the Thurlow court ruled that a _______  ____________________ 5. At oral argument, Santiago's attorney acknowledged that there is what he called "a brief, passing comment" in the Jenkins opinion that goes into the question of whether a _______ change of plea notice is "a motion requiring a hearing" under the STA. Still, he dismissed it as being "bad law" and as not having in consideration the rationale of cases like United States v. Thurlow, 710 F. Supp. 380 (D. Me. 1989), _____________ _______ which is more in harmony with the intent behind the STA. -20- 20 delay caused by the "general congestion of the courts" is not a sufficient basis for the exclusion of time from the STA's seventy-day time limit. Thurlow, 710 F. Supp. at 383. The _______ court thus concluded that an exclusion of time under the STA could not be granted for the period of time starting with the defendant's notice and ending with the court's hearing, because the delay was due solely to the court's scheduling requirements. See id. ___ ___ We remain unpersuaded. A defendant's request to change his plea clearly constitutes a pretrial motion, a motion which automatically triggers an exclusion of time. See 18 U.S.C. 3161(h)(1)(F) (1985). The weight of ___ authority is to this effect. In Sposito, Jenkins, Henderson, _______ _______ _________ and other cases, courts have agreed that the entire time between the filing of a pretrial motion and the hearing on that motion is excludable from the STA's seventy-day time limit. See, e.g., Henderson, 476 U.S. at 326-27; Sposito, _________ _________ _______ 106 F.3d at 1044; Jenkins, 92 F.3d at 440. Hence, the days _______ between December 1, 1995, the date Esquilin filed his motion for change of plea, and January 22, 1996, the date of Esquilin's actual change of plea hearing, are all excludable. On January 18, 1996, Santiago filed his motion to dismiss the superseding indictment for lack of a speedy -21- 21 trial. The district court denied the motion on January 23, 1996.6 Both parties agree that these six days are excludable. See 18 U.S.C. 3161(h)(1)(F) (1985). January ___ 23, 1996 was the first day of jury trial, bringing the STA clock to a stop in the instant case. See 18 U.S.C.  ___ 3161(c)(1) (1985).  We conclude that only forty-nine non-excludable days ran off the STA clock before the commencement of trial and that, therefore, no violation of Santiago's statutory right to a speedy trial occurred. 2. The Constitutional Right ________________________ Santiago insists that the delay in his being brought to trial violated his constitutional right to a speedy trial. We find no merit in this contention.  The Sixth Amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI (emphasis ______ added). This right attaches upon arrest or indictment, whichever occurs first. See United States v. MacDonald, 456 ___ _____________ _________ U.S. 1, 6-7 (1981); United States v. Mala, 7 F.3d 1058, 1061 _____________ ____  ____________________ 6. During trial, the district court ruled that Santiago's motion to dismiss had been "untimely", since it had been filed just prior to trial. We accept Santiago's argument that untimeliness would not, on this record, constitute a valid independent ground for denying the motion to dismiss.  -22- 22 (1st Cir. 1993); United States v. Colombo, 852 F.2d 19, 23 _____________ _______ (1st Cir. 1988). For Sixth Amendment purposes, Santiago is entitled to a computation of time from October 20, 1994, the date of his arrest. That there was no violation of the STA in this case would not necessarily preclude a court from finding a violation of Santiago's Sixth Amendment right to a speedy trial. See United States v. Koller, 956 F.2d 1408, 1413 (7th ___ _____________ ______ Cir. 1992). Section 3173 of the STA states that "[n]o provision of this chapter shall be interpreted as a bar to any claim of denial of speedy trial as required by amendment VI of the Constitution." 18 U.S.C. 3173 (1985); see also ___ ____ United States v. Mitchell, 723 F.2d 1040, 1049 (1st Cir. ______________ ________ 1983). "It would be, however, 'an unusual case in which the time limits of the [STA] have been met but the [S]ixth [A]mendment right to speedy trial has been violated.'" Mitchell, 723 F.2d at 1049 (quoting United States v. Nance, ________ _____________ _____ 666 F.2d 353, 360 (9th Cir. 1982)). This court reviews a district court's speedy trial determination under the Sixth Amendment for abuse of discretion. See Colombo, 852 F.2d at ___ _______ 21. In Barker v. Wingo, 407 U.S. 514, 530-33 (1972), ______ _____ the Supreme Court established a four-part balancing test to be used in determining whether a defendant's Sixth Amendment right to a speedy trial has been violated. See, e.g., Mala, _________ ____ -23- 23 7 F.3d at 1061. A court should consider: (1) the length of the delay; (2) the reason(s) for the delay; (3) the defendant's assertion of his speedy trial right; and (4) the prejudice to the defendant caused by the delay. See, e.g., _________ id. (citing to Barker, 407 U.S. at 530). "None of these ___ ______ factors is 'either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant.'" United States v. Henson, 945 F.2d 430, 437 (1st Cir. 1991) _____________ ______ (quoting Barker, 407 U.S. at 533). ______ The first factor, the length of the delay, was identified by the Supreme Court as: to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance. Nevertheless, because of the imprecision of the right to speedy trial, the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case. For example, the delay that can be tolerated for an ordinary street crime is less than for a serious, complex conspiracy charge. Barker, 407 U.S. at 530-31; see also Koller, 956 F.2d at ______ ___ ____ ______ 1413. The Supreme Court has said that "the lower courts have generally found postaccusation delay 'presumptively prejudicial' at least as it approaches one year." Doggett v. _______ United States, 505 U.S. 647, 652 n.1 (1992) (citations ______________ -24- 24 omitted); see also United States v. King, 909 F. Supp. 369, ___ ____ _____________ ____ 372 (E.D. Va. 1995). We shall assume, under the foregoing, that the fifteen month delay in this case was "presumptively prejudicial" so as to trigger further inquiry as to Santiago, see, e.g., Koller, 956 F.2d at 1414 (holding that an eight _________ ______ and one-half month delay was enough to warrant further inquiry); Colombo, 852 F.2d at 24 (holding that a twenty-four _______ month period was long enough to be presumptively prejudicial); King, 909 F. Supp. at 372 (holding that a ____ thirty-one month delay was sufficient to trigger the Barker ______ test). Still, we hold that the cumulative effect of the pretrial delay, viewed under all the factors set forth in Barker, falls far short of establishing a Sixth Amendment ______ violation. As noted, the length of the delay is both the trigger for the Barker analysis and one of the factors in ______ that analysis. See Colombo, 852 F.2d at 24. Once an ___ _______ examination of the Sixth Amendment claim is triggered, the weight given in the analysis to the length of the delay depends upon the extent to which the delay exceeds the bare minimum considered presumptively prejudicial. See Doggett, ___ _______ 505 U.S. at 652; King, 909 F. Supp. at 373. Santiago waited ____ over fifteen months for the commencement of trial in this case, a case more complicated than "an ordinary street crime" but less so than "a serious, complex conspiracy charge." -25- 25 Barker, 407 U.S. at 531. Arguably, therefore, the period of ______ the delay was long enough to tip the scales slightly in favor of Santiago's instant claim. The second factor, the reason(s) for the delay, has been called, "the focal inquiry." United States v. Sears, _____________ ______ Roebuck & Co., 877 F.2d 734, 739 (9th Cir. 1989) (citation ______________ omitted). As with the first factor, "[h]ere, too, different weights should be assigned to different reasons." Barker, ______ 407 U.S. at 531. Santiago argues that the chief contributor to the delay was the government's lack of diligence in advancing the transfer proceedings, and that the government used this period of time to further its case by debriefing minors Esquilin and Ramos, both of whom were eventually called to provide testimony against him. We find in the record below, however, scant indication that the length of the transfer proceedings was attributable to the government's misconduct or negligence. See Henson, 945 F.2d at 437 n.7; ___ ______ Colombo, 852 F.2d at 25. The rest of the delay in trying _______ Santiago resulted mainly from his own motion for a continuance of the trial and his codefendants' motions for changes of pleas. Santiago never sought relief from delays occasioned by his codefendants by requesting a severance. We conclude that the various delays were each justified by "a valid reason." Barker, 407 U.S. at 531. ______ -26- 26 The third factor, the defendant's assertion of his speedy trial right, "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right." Barker, 407 U.S. at 531-32; see also Colombo, 852 ______ ___ ____ _______ F.2d at 26. The failure to assert the right, the Barker ______ Court noted, "will make it difficult for a defendant to prove that he was denied a speedy trial." Barker, 407 U.S. at 532; ______ see also Colombo 852 F.2d at 26. A defendant should give ___ ____ _______ some indication, prior to his assertion of a speedy trial violation, that he wishes to proceed to trial. See Henson, ___ ______ 945 F.2d at 438-39; Sears, Roebuck & Co., 877 F.2d at 740; _____________________ Colombo, 852 F.2d at 26. _______ Santiago did not demand a speedy trial at any time prior to his motion to dismiss, which he filed immediately prior to the commencement of his trial. See United States v. ___ _____________ Vachon, 869 F.2d 653, 657 (1st Cir. 1989) (finding no ______ violation of any constitutional right in a case where the defendant did not raise the constitutional speedy trial issue until two days before trial). The record in this case suggests that Santiago only got around to demanding his speedy trial right when "it 'became a possible means by which to obtain dismissal of the charges against [him].'" Henson, ______ 945 F.2d at 439 (quoting Colombo, 852 F.2d at 26). Hence in _______ respect to the third factor, Santiago's failure to request a speedy trial earlier than he did weighs against him. -27- 27 The fourth, and final, factor -- the prejudice to the defendant caused by the delay -- "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect. Th[e] Court has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Barker, 407 U.S. at 532 (footnote ______ omitted); see also Koller, 956 F.2d at 1414. The Barker ___ ____ ______ ______ Court went on to discuss the disadvantages of lengthy pretrial incarceration for the accused who cannot obtain his release. See Barker, 407 U.S. at 532-33. We shall assume ___ ______ that many of those disadvantages were experienced by Santiago, who was subjected to over fifteen months of pretrial imprisonment without bail. However, the fifteen months of pretrial incarceration by itself was insufficient to establish a constitutional level of prejudice. Cf. __ Barker, 407 U.S. at 534 (finding that the prejudice was ______ minimal in a case in which the defendant spent ten months in jail before trial); Koller, 956 F.2d at 1414 ("Koller did ______ spend the entire eight and one-half months of delay in jail, but in Barker the Court found that ten months of ______ incarceration prior to trial was not sufficient to raise to the level of prejudice." (citation omitted)).  -28- 28 In respect to Santiago's anxiety and concern in awaiting trial, we do not weigh this heavily, especially where Santiago took no early action to expedite his trial, either by demanding an earlier trial or by seeking a severance from the minor codefendants. "While 'this type of prejudice is not to be brushed off lightly,' considerable anxiety normally attends the initiation and pendency of criminal charges; hence only 'undue pressures' are considered." Henson, 945 F.2d at 438 (citing Colombo, 852 ______ _______ F.2d at 25 (stressing that "the standard here is minimization, not necessarily elimination of the natural consequences of an indictment")).  "Among the three interests safeguarded by the right to speedy trial as guaranteed under the [S]ixth [A]mendment, 'the most serious is [protection against impairment of the defense] because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.'" Barker, 407 U.S. at 532 (citations omitted). There is no ______ indication here that the period of pretrial delay interfered in any way with Santiago's ability to present evidence or obtain the testimony of witnesses, or that it had any impact on the fairness of his trial. See Colombo, 852 F.2d at 25- ___ _______ 26. Accordingly, this paramount interest in no way favors Santiago's claim of constitutional impairment. -29- 29 We conclude, applying Barker's balancing test, that ______ Santiago's constitutional right to a speedy trial was not violated. B. Santiago's Due Process Right to Present Witnesses in His Santiago's Due Process Right to Present Witnesses in His Own Defense Own Defense Finally, Santiago contends that the district judge's strongly worded advice to defense witness Wanda Caceres concerning her right not to incriminate herself exerted such influence on her so as to prevent her from freely choosing whether to testify or not, in violation of Santiago's due process right to present witnesses in his own defense. See Washington v. Texas, 388 U.S. 14, 19 (1967) ___ __________ _____ ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law."). On January 30, 1996, Santiago called his stepmother Wanda Caceres to the witness stand. Before she could take the stand, however, the district court warned her of her right to refuse to testify because of the possibility that she might incriminate herself. The court stated, inter alia: -- Caceres, I want to advise you -- and listen to me carefully because this may have serious -- I would say severe consequences for you. Listen to this, what I'm going to tell you. -30- 30 If you're going to testify what Mr. Arroyo said you would, then I have to warn you that you will be incriminating yourself and you will be violating two statutes: One will be accessory after the fact, and I'm going to read to you. It says: Whoever, knowing that an offense against the U.S. has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment is an accessory after the fact. And listen to this carefully, listen to the penalty. I'm going to read to you the pertinent provision. In this case the maximum possible penalty is life for the defendant, life imprisonment, and the . . . statute says that whoever is an accessory after the fact exposes himself or herself as follows: If the principal is punishable by life imprisonment or death, the accessory -- that means you -- shall be imprisoned not more than 15 years. . . . .  So that's one of the offenses that you will be committing if you testify -- if -- I mean that can be charged against you by incriminating yourself. Second, there's another offense. A mis -- there's -- there's a misprision of a felony, and I'm going to read it to you. Whoever, having knowledge of the actual commission of a felony, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fine [sic] under this title or imprisoned not more than three years or both. It seems to me that it is my duty as a judicial officer to advise you, to warn you, that if you testify pursuant to what Mr. Arroyo said -- and that's your decision - - you will be incriminating yourself -31- 31 under oath in a record, and you may be exposed to 15 years in prison up to the maximum and also three years but [sic] misprision of a felony which might be served concurrently. But with your testimony on the record, that will be enough to take it to a grand jury to obtain an indictment against you, and you will be a defendant in this court. And under the sentencing guidelines you will most probably have to do time, serve time in jail. And there is no parole, no probation. . . . . So I want to warn you again for the last time so that if you do this you will do this knowingly and willfully and after having been advised about your -- your right not to be incriminated [sic] against yourself, but of course that is your decision. My duty is to advise you, to forewarn you about it. If you want to talk to your lawyer, I will give you an opportunity to talk to him." . . . . But -- let me put on the record again it is your own decision. I'm not coercing you into not testifying. I'm telling you may [sic] testify if you wish. If you wish to testify that's fine. You just go ahead and testify. I'm simply telling you the consequences that might ensue, and I underline the word "might," not that they "shall." After giving this warning, the court appointed an assistant federal public defender to advise Caceres regarding her right not to incriminate herself. Caceres consulted with this lawyer and then decided not to testify for Santiago. Santiago insists that, although the court had wide discretion to warn a witness of the constitutional right not -32- 32 to testify, it went too far in this instance. See United ___ ______ States v. Arthur, 949 F.2d 211, 215-16 (6th Cir. 1991). ("An ______ ______ abuse of that discretion can occur, however, when the district court actively encourages a witness not to testify or badgers a witness into remaining silent.")  Santiago argues that Caceres's testimony would have supported the defense theory that he was not a knowing and willing participant in the criminal venture, but rather was "merely present" at the scene of the crime. The witness, according to Santiago, was privy to post-offense conversations between the codefendants, and was entrusted with the purchase of airline tickets for them to leave the island. Caceres's testimony, Santiago says, would have shown that both Esquilin and Ramos had admitted that they had participated in the offense, and had indicated that Santiago was not a participant. In Webb v. Texas, 409 U.S. 95, 98 (1972) (per ____ _____ curiam), the Supreme Court said, respecting a judge's warning to a witness not to perjure himself, that:  in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify. -33- 33 Santiago likens the judge's comments here to those in Webb, pointing to the fact that Caceres had come to court ____ to testify on the defendant's behalf, and declined to do so only after the judge's lengthy and allegedly intimidating warning. The district court, Santiago concludes, should have put the more immediate interests of the defendant on trial and those of the general public in the fullest disclosure of the relevant evidence before the protection of the volunteering witness in this case. It is true that the court's admonition to the witness here was relatively detailed and strongly stated. However, the court was careful to emphasize that the witness could testify if she wished, and we do not believe that what was said came even close to exerting "such duress on the witness's mind as to preclude [her] from making a free and voluntary choice whether or not to testify." Id. ___ In Webb, the trial judge apparently suspected that ____ a prison inmate called as defendant's sole witness was bent on perjury. The judge admonished him that if he lied, the court would "personally see that your case goes to the grand jury and you will be indicted for perjury and the likelihood [sic] is that you would get convicted of perjury and that it -34- 34 would be stacked on to what you already got."7 Id. at 95-96. ___ No such threat, or threat of any type, was made here. Rather the court sought to advise this uncounseled witness of her constitutional right to avoid self- incrimination, having learned from defense counsel that she proposed to give testimony of an obviously incriminating nature. A further difference between this case and Webb is ____ that, here, the court ultimately provided the witness with counsel with whom she conferred privately before making her  ____________________ 7. The trial judge admonished the defense witness as follows: Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the likelihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lied, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against yo in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if yo do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking. Webb, 409 U.S. at 95-96 (internal quotation marks omitted).  ____ -35- 35 decision whether to testify. The provision of counsel helped assure that Caceres's decision was made voluntarily, in her own interest, rather than being the product of judicial coercion.8 The court took pains here to emphasize that Caceres could testify if she wished. The Webb judge's sparse ____ comments along similar lines were weakly stated and were overshadowed by the court's threats to proceed against the witness for perjury if he took the stand. Santiago also relies upon the Sixth Circuit's Arthur decision. Unlike Webb, Arthur involved a judicial ______ ____ ______ warning to a witness about Fifth Amendment rights. The  ____________________ 8. After Caceres received advise from Assistant Federal Public Defender Carlos Vazquez, the following exchange took place: "MR. VAZQUEZ: Your Honor, we have talked both with Mr. Arroyo and the witness in this case. We have once again explained to her her rights and the possible or probable consequences of testifying or not testifying. And after this discussion this witness has opted not to continue testifying in this case. THE COURT: She will not testify? She hasn't testified at all. MR. VAZQUEZ: Then she will not testify.  THE COURT: Very well. Let me ask you, did you heard [sic] counsel, what he said?  WANDA CACERES: Yes. THE COURT: And what is your decision? WANDA CACERES: Not to testify. THE COURT: Very well. You're excused. You may step down."  -36- 36 witness, however, had his own attorney and stated to the district court, after being advised of his rights, that he wanted to testify in order to clear the defendant. Arthur, ______ 949 F.2d at 214-15. Instead of acquiescing, the court continued to warn the witness of the adverse consequences of testifying, finally saying, "I think it's not in your best interest to testify because anything you say may be held against you in another prosecution against you for bank robbery, could and would be used against you." Id. After ___ that, the witness changed his mind about testifying.  The Sixth Circuit, citing Webb, held that it was an ____ abuse of discretion for a judge to repeatedly inform the counseled witness, after the witness had stated that he wanted to testify following an initial warning, of his right to remain silent and that to testify was against his interest. Id. at 216. ___ In the present case, there was no repetition of warnings after an informed announcement of an intent to testify, nor did the court keep insisting on a decision not to testify, as was done in Arthur. To the contrary, the ______ district judge made the following statement: But I -- let me put on the record again it is your own decision. I'm not coercing you into not testifying. I'm telling you may testify if you wish. If you wish to testify that's fine. You just go ahead and testify. I'm simply telling you the consequences that might -37- 37 ensure, and I underline the word 'might,' not that they 'shall.' We conclude that Caceres was not "badgered" by the court into declining to testify. Rather, the district judge's warnings were meant to strengthen rather than to weaken the voluntariness of Caceres's choice by informing her of the risks inherent in her proposed testimony and of her constitutional right not to testify.  In doing this, the judge might understandably be concerned lest the uncounseled Caceres be manipulated unfairly by defendant, to her own great disadvantage. Providing Caceres with access to a public defender before she took the stand further assured that her decision whether or not to testify would be an informed and voluntary one. A judge is entitled to make sure a witness understands her Fifth Amendment rights. While different trial judges might handle the matter differently, we see no impropriety in the court's conduct, and no duress precluding a free and voluntary choice. To the contrary, the court sought to facilitate the ability of the witness to make an informed choice free from coercion by the defendant or anyone else. We conclude there was no error in the character of the warnings given to Caceres by the district court in this case. While the judge's language was forceful, he made it clear that she was free to testify and we may presume that her provided counsel confirmed that right. We conclude that -38- 38 Santiago's due process right to present witnesses in his own defense was not compromised by Caceres's voluntary decision not to take the stand, and that the court's handling of the matter was within its discretion. Affirmed. ________ -39- 39