UNITED STATES of America,
Plaintiff,

v.

**Luis GINES PEREZ and Ricardo Melendez Perez, Defendants.**

**No. CRIM 98–164 DRD.**

United States District Court,
D. Puerto Rico.

June 5, 2001.

Edwin O. Vazquez–Berrios, U.S. Attorney's Office District of P.R., Criminal Division, Hato Rey, PR, for plaintiff.

Jorge L. Arroyo–Alejandro, San Juan, PR, William D. Matthewman, Boca Raton, FL, Epifanio Morales–Cruz, Federal Public Defender Office, San Juan, PR, Steve Potolsky, Miami, Fl, Miriam R. Ramos–Grateroles, Bayamon, for defendants.

## AMENDED OPINION AND ORDER

DOMINGUEZ, District Judge.

Defendants, LUIS GINES PEREZ, hereinafter referred to as "Gines" and RICARDO MELENDEZ PEREZ, hereinafter referred to as "Meléndez" are accused of a conspiracy to possess with intent to distribute and to distribute multi kilograms of heroin and substances containing cocaine all in violation of Title 21 U.S.C.

§ 846.[1] Several overt acts are described in the indictment. Codefendants Gines and Meléndez are further charged, as part of the fifteen count indictment, with a count of murder during and in relation to a drug crime under 18 U.S.C. § 1111 and 18 U.S.C. § 924(j) and (2). Gines and Meléndez in counts six through twelve are charged with money laundering. As to this offense monies were wire transferred involving the proceeds of the illegal drug activities camouflaged as genuine financial transactions knowing that said transactions represented the proceeds of illegal transactions all in violation of 18 U.S.C. § (a)(1)(B)(i) and (2). (See Second Superseding Indictment May 11, 2000, Docket No. 228).

Codefendants Gines and Meléndez have requested the court to revisit the bail denials previously entered as to them based on new evidence, (Docket No. 304). The recently acquired evidence is that the government's principal witness, Luis Torres, failed a polygraph examination as to the killing of victim Miguel Huertas. Defendants allege and emphasize that the polygraph test (only two questions were asked) points to Luis Torres himself as the killer. Luis Torres plead guilty as to the drug and murder conspiracy. Defendants urge that bail must therefore be revisited and granted.

Further, Gines and Meléndez urge the court that since they have been detained since July 6, 1998 (Gines) and September 5, 1998 (Meléndez), the length of pre-trial detention mandates under due process standards their release. *United States v. El-Hage,* 213 F.3d 74, 78–80 (2nd Cir. 2000); *United States v. Ojeda Rios,* 846 F.2d 167 (2nd Cir.1988); *United States v. Zannino,* 798 F.2d 544 (1st Cir.1986).

## I. PROCEDURAL HISTORY

A detailed procedural history of the case is necessary in order to place the issues in perspective.

Codefendant Gines was ordered detained by the Magistrate Judge on July 10, 1998, because he was accused of a narcotic violation under 21 U.S.C. § 841(a)(1) and 846, for which a time of imprisonment of ten years or more is prescribed. The Magistrate Judge concluded that the defendant was a serious flight risk and a danger to the community. The Magistrate Judge found that when defendant was stopped for driving a reported stolen vehicle, he consented to a search. The search revealed as protruding underneath the passenger seat of the vehicle, around 1.3 kilograms of heroin. Defendant further had a prior criminal record for failure to report currency in excess of requirements of the law and was under supervised release. During the time of supervised release the defendant tested positive to the use of drugs in three separate occasions. Further, the defendant made several trips outside the United States to wit, Venezuela, Colombia, Panama, Mexico and Jamaica. All of the above clearly enhanced the statutory presumption of "flight" and "danger to the community" under 18 U.S.C. § 3142(e). *United States v. Jessup,* 757 F.2d 378, 380–84, (1st Cir.1985)(*See* Dockets nos. 9, 10).

Codefendant Meléndez was similarly ordered detained without bail by the Magistrate Judge in November 9, 1998, because he was also charged with violating a narcotic law for which a maximum term of ten years or more was prescribed under 21 U.S.C. § 846. The Magistrate Judge found the defendant to be a flight risk and a danger to the community.

1. Another codefendant is also charged in the conspiracy count of the indictment, Efren Andrades. He is not a subject to the bail matters currently under consideration.

"The nature and particular circumstances of the offense charged together with the strength of the government's case and the severities of the penalties the defendant faces gravitate toward a finding that he is a risk of flight. That he probably killed a business partner [in the drug venture] with another defendant weights heavily in this determination, notwithstanding the defense presentation at the detention hearing." (*See* Docket no. 51.)

Codefendant Gines initially requested a De Novo Bail Hearing, (Docket No. 35), but later withdrew the motion on November 12, 1998, (Docket No. 54 in chambers Minute entry.) No further motion relating to bail matters was submitted to the court, until the recent motions filed by Gines to reopen bail two years latter on November 16, 2000, (Docket No. 304).

Several salient substantive and procedural matters have occurred in the case. The court explains. The United States informed the court on November 2, 1998, of a potential Death Penalty Eligible case, pursuant to Local Rule 428, based on count two of the superseding indictment entered on October 23, 1998, and founded on the allegations of the indictment wherein codefendants Gines and Meléndez were charged with murdering an individual called Huertas. (See Docket No. 48.) The court assigned Mr. Steven W. Potolsky as learned counsel for Gines and Mr. William Mathewman for Meléndez. Learned counsel Potolsky was immediately appointed by the court for Gines since the court detected a strong possibility as to Gines being Death Penalty eligible. (Docket No. 53 Minutes of in chambers conference.) The court initially deferred appointing learned counsel for codefendant Meléndez until further proceedings relating to the Death Penalty developed (Margin Order dated November 11, 1998, at Docket No. 49).

The court nonetheless in reconsideration appointed Mr. Mathewman on December 29, 1998, as learned counsel.

The six-month period granted to the United States to determine Death Penalty Notice under Local Rule 428 was extended initially for thirty (30) days at the request of defendants. The request was granted, in order to allow the defendants to provide mitigating circumstances to the Death Penalty Eligible Committee. (*See* Docket No. 76). The reporting date as to the Notice was March 6, 1999. At the request of the United States the date was further extended by the court to April 9, 1999, in order to allow the United States to seek further information requested by the Death Penalty Eligible Committee on acts performed by a certain witness, (Dockets No. 83 and 96). The Death Penalty, as a potential sentence, was eventually notified by the United States to the court as to Gines and Meléndez on April 9, 1999, (Docket No. 87).

Local counsel for defendant Gines advised of a potential conflict of interest on December 16, 1998, created by the fact that he had been counsel for the purported principal witness of the government, Luis Torres, who was testifying as to both the drug conspiracy and the murder counts of the indictment. (Docket No. 63). Initially, local counsel for Gines requested the court not to decide the matter until the potential death penalty sentence issue was finally resolved, because the potential conflict could be diminished should there be additional counsel on behalf of Gines (the "learned counsel") that could effectively cross-examine the witness for the government, Luis Torres, (Docket No. 77, Minutes of Status Conference; hearing continued sine die). The motion thus remained in abeyance at the request of codefendant Gines for a period of four months until the death penalty sentence issue was resolved.

The matter of the potential conflict remained unresolved for various further weeks, because defendants requested the striking of the death penalty after the same was officially notified. (Docket No. 95, Minutes.) Subsequently, a hearing was held on potential waivers by the affected persons, but further hearings had to be called because the waiver of the former client of local counsel Rivera was also necessary as determined by the court. (See Docket No. 206.) [2] The court scheduled final oral arguments on October 7, 1999, (Docket No. 153). The matter of disqualification thus took ten months to be submitted.

The court further held in abeyance a decision on the matter since there was a procedure before the Grand Jury being contemporaneously held that could have clearly determined the conflict of interest matter, (Docket No. 67, Sealed Motion).[3] The period of time the court waited did not affect procedures leading to a trial since there were other motions and matters as discussed below which were already delaying the case and because counsel Jorge L. Arroyo representing codefendant Meléndez was then at a long duration trial before another Judge of this district. After various submittals, hearings and memorandums, the court determined to disqualify counsel Rivera on March 28, 2000, (Docket No. 206).

Defendant Gines filed a Motion to Suppress in April 16, 1999, (Docket No. 93). The motion was originally set for a hearing on May 13, 1999. However, codefendant Gines requested that the hearing not take place until the disqualification matter be decided, (Docket No. 98). Notwithstanding, the hearings were scheduled before the court decided the disqualification matter. The initial hearing was rescheduled for August 4, 1999. Hearings were held on August 4, 5, 24 and 25 of 1999, and the hearing set for September 20, 1999, was continued at the request of AUSA Teakell because on the same date he had a trial with Judge Perez Gimenez and because "there is no trial set [in this case] . . . and one will not be set in the near future," (Docket No. 142). No trial had been set because the disqualification of counsel Rivera was pending and local counsel for codefendant Meléndez, Jorge L. Arroyo, had informed his unavailability, as he was then trying another case before Chief Judge Cerezo, *United States v. Israel Ruiz–Caceres*, 95–405, which case was to last several months. (See Docket No. 135.) Counsel Jorge Arroyo attended said trial from May 12 until December 14, 1999. A further hearing date on November 4, 1999, was requested to be continued by counsel Rivera because learned counsel was unavailable, (Docket No. 158). Additional hearings as to the Motion to Suppress were held on November 30, December 1, 2, and 16 of 1999, (Dockets Nos. 164–166, 174). Further hearings were held on January 18, 2000, (Docket No. 178). Counsel for the defense requested two extensions to file the memorandum of law, (Dockets No. 188, 191). The memorandum of law was filed on March 8, 2000, (Docket No. 198). The United States' memorandum was filed on April 6, 2000, (Docket No. 211). The United States was also granted one extension of time, (Docket No. 203). In the meantime codefendant Efren Andrades also filed a Motion to Suppress on June 4, 1999, joining the motion that codefendant Gines had filed, (Docket No. 112). Defendant Gines then filed a Reply Memorandum on

---

2. Witness for the government Luis Torres refused to waive the potential conflict of interest of counsel Rivera. (See Docket No.206.)

3. The motions were latter unsealed for the benefit of the defendants and their respective counsel. (Docket No. 261.)

April 19, 2000, (Docket No. 218). The government was authorized to respond and responded on May 10, 2000, (Docket No. 225). Hon. Magistrate Judge Arenas denied Gines' Motion to Suppress as well as that of codefendant Andrades on June 20, 2000, by separate Reports and Recommendations, (Dockets No. 247, 248). The Magistrate Judge granted the parties thirty days to object to the Report and Recommendation. Codefendant Gines filed a timely opposition on July 20, 2000. (Docket No. 260). Notwithstanding, the pending appeal to the District Judge of the Motion to Dismiss, defendants announced on a status conference held on November 16, 2000, to the District Judge that they would be filing a motion to reopen before the Magistrate the Motion to Dismiss based on witness/cooperator Luis Torres failed polygraph, (Docket No. 326, § 4, Minutes of Proceedings).[4] Codefendant Andrades did not seek any review of the Magistrate's Report and Recommendation. From filing date (4–16–99) until the decision by the Magistrate Judge (6–20–00), the motion to dismiss took one year and two months of time to be adjudicated. Further, recently on April 4, 2001, codefendant Gines filed a motion requesting reopening of the Motion to Suppress, (Docket No. 93), based on newly discovered and material evidence, (Docket No. 362).

Because there is a constitutional due process challenge by the defendants based on the amount of time under custody allegedly mandating bail, the court now analyses the procedural history as to the trial settings by the court in the instant case.

Although the Death Penalty enhancement matter had not been determined by the Attorney General when the court met with counsel on January 28, 1999, at one of the earlier status conference hearings held in chambers, the court advised counsel that it had intent to try the case sometime in September or October 1999. Counsel for codefendant Meléndez, Jorge Arroyo, advised that he would be trying the case of *United States v. Lorenzo Muñoz Franco,* 95–386, scheduled to commence trial on May 1999 which was then assigned to Chief Judge Cerezo. The court therefore abandoned trial setting in the instant case for the months during which trial was to be held in case no. 95–386, which was then thought to be around four to six months. Hence the trial contemplated by the court on "September or October 1999" was not feasible, (Docket No. 77).

Because the case of *United States v. Lorenzo Muñoz Franco,* 95–386, apparently was not going to proceed to trial, the court at a latter status conference held on April 19, 1999, once again contemplated trial setting for August 1999, (Docket No. 95). At the status conference held on May 24, 1999, the court once again revisited setting the trial in August 1999. Local counsel for Meléndez, counsel Jorge L. Arroyo, then advised the court that he was currently trying the case of *United States v. Israel Ruiz–Caceres* et al., Crim. No. 95–405, then representing specifically codefendant Flores Plaza. (The trial actually lasted from May 12 until December 14, 1999.) The court then stated that the

---

**4.** A further status conference was held on November 16, 2000. The parties apprized the court on matters pending:

1....
2....
3....
4. Defendant Gines announces the filing of a motion for an Evidentiary Hearing concern-

ing government's concealment of failed polygraph of the key prosecution witness and the prejudice to the defendants of the government's failure to disclose this information. Based on this new information, defendants will request a re-hearing before U.S. Magistrate–Judge Arenas on the credibility issue of the Motion to Suppress, Dkt. No. 93.

matter of trial setting would be revisited at the conference of July 1999, (Docket no. 108).[5]

At the status conference of July 1999 the court was forced to abandon all plans to try the case in 1999. Attorney Arroyo advised at the monthly status conference that the case in chief of the government in case 95–405 would last until "the mid of September 1999" and thereafter he had a trial scheduled with the undersigned in case 96–386.[6] Further, learned counsel Potolsky advised of a death penalty case attended by him before Judge Fusté in criminal case number 97–284, set for trial in early October. The court requested counsel Arroyo and Potolsky to advise the court pursuant to the case of *United States v. Santiago–Becerril*, 130 F.3d 11, 16 (1st Cir.1997) on their availability to try the case enabling the court to set the case for trial because the court was delaying trial due to counsel unavailability. The court, at the status conference held on July 1999, in a pertinent part stated "in light of the situation [counsels prior commitments and continued trials], potential trial date for August 1999 cannot be held due to defense counsel commitments." (Docket No. 119).

At the August 1999 conference, attorney Arroyo was once again advised his unavailability, (Docket No. 135). He was still in trial in case 95–405.

At the October 7, 1999, conference, (Docket No. 153), local counsel for codefendant Meléndez, Jorge L. Arroyo, informed that the case he was trying, criminal number 95–405, was still ongoing and that trial would continue until the "second week of November 1999." Once again the court reminded counsel Arroyo to advise

the court as to his availability enabling the court to latter timely set a trial date pursuant to the teachings of *United States v. Santiago–Becerril*, 130 F.3d at 16–17. (Once the court puts on hold a potential trial date at the request of counsel because of counsel for the defense unavailability, counsel must advise the court his availability, the court then sets the trial at "an available window.")

No status conference was held during the months of August 1999–January 2000. During this time Magistrate Judge Arenas held various hearings relating to the Motion to Suppress. (See infra p. 141). The court further did not deem pertinent to meet with the parties until after the suppression motion was decided by the Magistrate Judge and after the court decided the matter of the disqualification of counsel Rivera. (See Docket No. 153), "the case will be set for a further status conference" after Magistrate's Report and Recommendation is issued on the Motion to Suppress. The suppression motion of "Gines" and "Andrades" were separately decided in June 20, 2000, (Dockets No. 247, 248), and the disqualification matter on March 28, 2000, (Docket No. 206). The court, however, met with counsel on June 6, 2000, (Docket No. 249), relating to an ongoing matter before the Grand Jury in the instant case. The matter had relationship with the Sealed Motion previously filed in the case, (Docket No. 67). Counsel Jorge L. Arroyo had still not informed to the court as to his availability, simply because he was then trying a case at the undersigned Judge's courtroom since April 14, 2000, which lasted until August 18, 2000, *United States v. Flor de María Cacho et al.*, Criminal No. 97–145.

---

**5.** Attorney Rivera, counsel for Gines, also advised that he was trying in August two criminal cases already set for trial of defendants who were also under custody.

**6.** Counsel Arroyo clearly then contemplated trying case 96–386 before the instant case 98–164.

At the August 29, 2000–conference, (Docket No. 272), the defendants raised for the first time the issue of bail based on defendant's custody of two years, (Docket No. 272). Defendants then requested a trial date after the Motion to Suppress, (Docket No. 93), was decided. The court was surprised because no motion had been received by the court on counsel Arroyo's availability as requested by the court.[7]

At the Status Conference of September 2000, (Docket No 285), counsel Arroyo advised that he was counsel in a case transferred to the undersigned by Judge Cerezo, *United States v. Muñoz Franco*, Criminal No. 95–386, then scheduled to commence on October 30, 2000. Notwithstanding, the court set the instant case for trial on January 22, 2001 at 9:00 a.m. in the event that the trial of *United States v. Muñoz Franco*, Criminal No. 95–386, could not be held. The case of *United States v. Muñoz Franco*, had been originally set for trial in an Order dated January 4, 2000, for jury selection and trial on August 28, 2000, (see Docket No. 662 at Cr. No. 95–386). Several continuances were granted at the request of defense counsel, jury selection began in the Muñoz Franco case on November 28, 2000, (Docket No. 838), and trial on January 29, 2001, (Docket No. 875). Counsel Arroyo continues at this writing trying the Muñoz Franco case and hence continues to be unavailable to try this case.

Notwithstanding, even assuming the availability of counsel Arroyo, defendants have taken procedural actions reflected on the record that make it clear that the instant case is not ready for trial even at this writing. Defendants announced in November 16, 2000, (Docket No. 326, § 4), that based on the fact that Luis Torres failed the polygraph, the defendants were to file for a rehearing before the Magistrate Judge on the credibility issue of Luis Torres, which would affect the outcome of the Motion to Dismiss previously decided by the Magistrate Judge, (Docket No. 93). Hence, the Motion to Suppress then under advisement of the District Court was first to be referred back to the Magistrate Judge seeking a different result, based on Luis Torres' credibility as affected by the failed polygraph test.[8]

In November 8, 2000, defendant Meléndez filed two Motions to Suppress Evidence, (Dockets No. 293, 294), requesting that objects seized in warrantless searches of his residence in Orlando, Florida and Guaynabo, Puerto Rico, be eliminated. Defendant further filed in November 28, 2000 two Motions to Dismiss based on Violations to Due Process and Multiplicitorious Counts, (Dockets No. 312 and 313). Further, defendants recently filed on April 4, 20001, the Motion Requesting Reopening of the Suppression Hearing announced on November 16, 2000, (Docket No. 362).

The United States withdrew the Notice of Intent to Seek Death Penalty on January 9, 2001, (Docket No. 330).

The court now analyses the request of Gines and Meléndez for bail first based on the failed polygraph of cooperator and co-

---

7. At oral argument relating to the de novo bail hearing before the undersigned Judge on February 28, 2001, Docket No, 354, counsel Arroyo argued that he could have seen the instant case in January–February 2000. However, counsel Arroyo was then trying the case of *U.S. v. Caraballo-Gonzalez,* criminal 96–105 before District Judge Casellas which lasted from January 27, 2000 until February 17, 2000. (Said criminal case was older than the instant case.)

8. The court fails to see how the credibility of Luis Torres affects the Motion to Suppress since he is not related to said Motion to Suppress. (Motion related to drugs found in car of Gines and other incriminatory evidence found in crew cabin of Andrades.)

conspirator Luis Torres and then based on the alleged due process violation founded on the custodial time elapsed as to both defendants.

## II. BAIL BASED ON THE FAILED POLYGRAPH EXAMINATION UNDER THE BAIL REFORM ACT, 18 U.S.C. § 3142

As stated above, codefendants Gines and Meléndez were detained without bail early in the proceedings of this case. (Gines on July 10, 1998, Docket Nos. 9 and 10; Meléndez on November 9, 1998, Docket No. 51.) The detention remained unchallenged until November 16, 2000, when codefendant Gines requested to reopen the detention hearing, (Docket No. 304). The first reason advanced for the granting of bail is that on October 29, 1999, the principal witness failed a polygraph test. Defendants allege that deception on the answers provided by Luis Torres at the polygraph examination [9] warrant bail because Torres has accepted participating in the drug conspiracy and in the murder. The witness has further allegedly accepted that his fingerprints could be present on the weapon. The court referred the bail reopener to the Magistrate Judge, he held a hearing and denied bail, (Docket No. 334, January 16, 2001). Thereafter, codefendant Gines filed a timely objection to the Magistrate's Report and Recommendation, (Docket No. 339). The district court held a hearing on February 26, 2001, (Docket No. 354). Both codefendants requested that the record to remain open to submit specific proposals on the persons willing to submit bail, the quantities offered by the sureties and the conditions. Codefendant Meléndez com-

plied on March 2, 2001, (Docket No. 359). The matter of the bail was submitted to the court on April 6, 2001, when Gines provided the potential sureties, (Docket No. 363).

The court accepts the reopening of the bail hearings as to both codefendants based on 18 U.S.C. § 3142, (new information not previously discovered). *United States v. Byrd,* 969 F.2d 106 (5th Cir.1992). The court shall also consider the polygraph matter in a non-jury detention hearing. *United States v. Posado,* 57 F.3d 428 (5th Cir.1995). However, notwithstanding the polygraph failure by Luis Torres, the evidence against each of the defendants, Gines and Meléndez, is strong not only as to drug conspiracy but also as to the laundering and even the murder conspiracy. Moreover, the criteria required to be examined pursuant to the Bail Reform Act of 1984, 18 U.S.C. § 3142, preponderate in favor of detention. The court explains.

■ The court is required to make a de novo review of the contested Detention Order. *United States v. Tortora,* 922 F.2d 880, 883 n. 4 (1st Cir.1990).[10]

The court starts the required analysis with an examination of the superseding indictment, (Docket No. 228), wherein the defendants are charged in Count One with a conspiracy to possess with intent to distribute multi kilograms of heroin and cocaine in violation of 21 U.S.C. § 846. The object of the conspiracy was to import multi kilograms of heroin and cocaine and distribute the same in Puerto Rico. Substantial income would be obtained from the illegal venture. Moneys obtained from the

---

**9.** The questions asked were the following: (1) Did they tell you Miguel was going to be shot that day?; (2) Did you shoot Miguel?

**10.** The court also notes the illustrated opinion of District Judge Keeton in *United States v.*

*Phillips,* 732 F.Supp. 255, 258–259 (D.Mass. 1990), requiring "the court to exercise independent consideration of all facts properly before it."

illegal activity relating to the possession and distribution of the drugs would then later be laundered to camouflage the illegal activity. Various overt acts are described in the conspiracy. On or around July 6, 1998, Gines and Efren Andrades possessed with intent to distribute around 1.4 kilograms of heroin. (The subject of the suppression motion, Docket No. 93.) On July 14, 1998, Gines possessed with intent to distribute 56.3 grams of heroin. On July 1, 1998, Gines and Meléndez shot and killed Miguel Huertas because he allegedly stole money from the proceeds of Gines' and Meléndez's heroin and cocaine trafficking activities. Heroin and cocaine was imported into Puerto Rico via suitcases and distributed in Puerto Rico. Moneys obtained from the drug proceeds would in turn be laundered, deposited in bank accounts and transferred to South America. Money laundered from drug activity in the amount of $41,300.00 was sent by Gines using U.S. Postal money orders. Money in the amount of $36,470.00 was laundered by Gines and Ricardo Meléndez and transferred from Puerto Rico to St. Martin.

Count two of the indictment charges that Gines and Meléndez using a firearm, aiding and abetting each other, conspired to kill Miguel Huertas during and in relation to a drug crime as described in Count I constituting a first degree murder as defined in 18 U.S.C. § 111, all in violation to 18 U.S.C. § 924(j) and (2).

Count three charges Gines and Andrades with possession with intent to distribute 1.4 kilos of heroin in violation of 21 U.S.C. § 841(a)(1) and § 2.

Count four and five charges Gines with the possession of a firearm having been convicted of a felony in violation of 18 U.S.C. § 922(g)(2) (felon in possession of a weapon). Count five charges Gines with possession with intent to distribute 56.3 grams of cocaine in violation of 21 U.S.C. § 841(a)(1). Counts six through twelve charge Gines and Meléndez with money laundering activities in order to camouflage as genuine money proceeds derived from the illegal drug transactions. Count thirteen charges Gines and Meléndez with structuring payments in the amount of $35,000.00 to evade reporting obligations pursuant to law all in violation of Title 31, Section 5324 and 5322(b) and 18 U.S.C. § 2. Gines is also charged with participating in other financial transactions in Counts fourteen and fifteen in order to evade reporting disclosures required by law in violation of 18 U.S.C. § 1956(a)(B)(i) and 31 U.S.C. § 5313(a) and § 2.

■ The Bail Reform Act of 1984, 18 U.S.C. § 3141 et seq. at § 3142(f)(1)(c) and (e), sets forth the presumption that no condition or combination of conditions will reasonably assure the appearance of the accused as required and the safety of the community, if there is probable cause to believe that the person committed an offense for which the term of imprisonment of ten or more years is prescribed in the Controlled Substance Act, 21 U.S.C. § 801. *United States v. Dillon,* 938 F.2d 1412, 1416 (1st Cir.1991). In the instant case the presumption is triggered by the quantities of drugs alleged in the indictment mandating a ten-year minimum sentence. 21 U.S.C. § 801 et seq. (Multi kilograms of cocaine and heroin.) [11] The presumption is also independently triggered by the murder count during and in relation to a drug crime. 18 U.S.C. § 3142(f)(1)(A) (crime of violence).

11. Multi kilograms of heroine and cocaine are alleged in the conspiracy count as to both Gines and Meléndez. 18 U.S.C. 3142(f)(1)(C).

The legal presumption has a "significant practical effect." *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir.1985). The presumption, however, does not shift the burden of persuasion to the defendant, the government retaining the burden throughout. The defendant, nevertheless, once the presumption is triggered, is required to carry the burden of production. *Jessup*, 757 F.2d at 380–384.

The presumption established is that "... it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed an offense for which a maximum term of imprisonment of ten or more years is prescribed in the Controlled Substances Act, (21 U.S.C. § 801 et seq.)" 18 U.S.C. § 3142(e). The presumption created is of "flight" and "danger." *Jessup*, 757 F.2d at 381.

█ Once the presumption is triggered, the defendant is required to produce "conflicting evidence" to undercut the legislative purpose of the presumption. *Jessup*, 757 F.2d at 383, (but it is not merely any evidence that destroys the presumption since the "bursting bubble theory" was rejected by then Chief Circuit Judge Bryer at *Jessup*, 757 F.2d at 382–83). An "intermediate position" was adopted in *Jessup* requiring the defendant to produce "conflicting evidence" as to "danger" and "flight." [12] The court then "determine[s] on which side the evidence preponderates." *Jessup*, 757 F.2d at 383 (citing *Wright v. State Accident Insurance Fund*, 289 Or. 323, 613 P.2d 755, 759–60 (1980)).

Trial judges were reminded in *Jessup* 757 F.2d at 384, that Congress in establishing the flight presumption found that "flight to avoid prosecution is particularly high among persons charged with major drug offenses." Senate Judiciary Report # 225, 98th Congress 1984 p. 20, 1984 U.S.Code Cong. & Admin. News, p. 23, and further that "drug traffickers often have established ties outside the United States ... [and] have both the resources and foreign contacts to escape to other countries." [Id].

█ The court in *Jessup*, 757 F.2d at 384, explained the following procedure on the proper method of "rebutting the presumption": "In order to 'rebut' the presumption, the defendant must produce some evidence; the magistrate or judge should then still keep in mind the fact that Congress has found that [drugs] offenders, as a general rule, pose special risks of flight." Even after a defendant has produced evidence to rebut the presumption, "the presumption does not disappear, but rather retains evidentiary weight—the amount depending on how closely defendants' case resembles the Congressional paradigm, *Jessup*, 757 F.2d at 387—to be considered with other relevant factors." *United States v. Palmer–Contreras*, 835 F.2d 15, 17 (1st Cir.1987).

Finally, the court, in making its determination as to bail or detention after receiving the rebuttal pursuant to § 3142(g), must consider among other factors, "the nature and circumstance of the offense," "weight of the evidence," "history and characteristics of the person including ... character, physical and mental condition, family history ... past conduct." *United*

---

12. *Jessup*, 757 F.2d at 383 (citing the theory of Hecht and Pinzier, Rebutting Presumptions: Order Out of Chaos, 58 B.U.L.Rev. 527 (1978); *Jessup* (Id.) further states that "the House of Judiciary adopted [an] 'intermediate position' ....").

*States v. Jessup, Id.; United States v. Tortora*, 922 F.2d 880, 883 (1st Cir, 1990).[13]

In the instant case, a drug conspiracy involving the importation, possession with intent to distribute and distribution of multi kilos of heroin and cocaine is alleged in Count I of the indictment. The presumption of detention is triggered by the overt act of possession with intent to distribute 1.4 kilos of heroin and 56 grams of heroin (Gines) and the multi kilo allegation as to cocaine and heroin as to Gines and Meléndez, 18 U.S.C. § 3142(f)(1)(C). The first degree murder of Miguel Huertas under 18 U.S.C. § 1111, using a firearm during and in relation to a drug crime as alleged in Count II constitutes a separate and independent reason activating the presumption of detention as to both Gines and Meléndez under the law, 18 U.S.C. § 3142(f)(1)(c) and (e).

The court briefly examines the required statutory factors under the Bail Reform Act as applied to both Gines and Meléndez.

In the instant case a presumption as to "flight risk" and "danger to the community" has been statutorily triggered by codefendants Gines and Meléndez's participation in a multi kilogram conspiracy to possess with intent to distribute multi kilograms of cocaine and multi kilograms of heroin.[14] Ten years or more of imprisonment is mandated for a conspiracy of one kilo of heroin and of five kilos of cocaine, 21 U.S.C. § 801, *United States v. Dillon*, 938 F.2d at 1416.

The court deems uncontroverted that the instant offense involving smuggling, possession and distribution in excess of one hundred kilograms of cocaine and multi kilograms of heroin, murdering a coconspirator and, engaging in substantial money laundering, all as part of the conspiracy is a serious offense.

■ Codefendant Gines has a prior criminal federal record consisting of not reporting excess currency for which he was placed on probation for three years on February 28, 1997. He was further found to be in violation of probation by testing positive to illicit drugs during three occasions. The instant drug offense carried on from June 1997 through September 1998 further violates defendant's probation. Gines' "history and characteristic" of him as a person incline the court towards detention, although the court finds that he has strong community ties in Puerto Rico.

The weight of the evidence proffered as to both codefendants is strong as to the drug conspiracy, the murder and the money laundering.[15]

As to the drug conspiracy, Gines was found with 1.4 kilos of heroin in the car he was driving, a suitcase in his residence yielded positive to heroin; he has a valid passport and traveled frequently to Venezuela, Colombia, Panamá and México; including a one-day round trip to Colombia. There is at least one cooperator who will testify as to the cocaine/heroin drug con-

---

13. "In determining whether suitable conditions [for bail] existed, a judicial officer was required to take into account the following: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence as to guilt or innocence; (3) the history and characteristics of the accused, including past conduct; and (4) the nature and gravity of the danger posed by the person's release."

14. The United States proffered in excess of one hundred kilograms of cocaine.

15. Bail Procedure under the Bail Reform Act may proceed via "proffer" at the court's discretion, *United States v. Acevedo–Ramos*, 755 F.2d 203, 208 (1st Cir.1985) (court citing House Judiciary Committee H.R.Rep. No. 907, 91st Congress, 2nd Session 182, 184 (1970)).

spiracy from St. Martin to Puerto Rico. There is also an additional confidential source who is to testify as to the drug conspiracy. As to the murder there is one cooperator, Torres, who will testify that Gines shot and killed Huertas in furtherance of the conspiracy. The weapon that killed Huertas was seized by the authorities in the office of Gines, on top of his computer. Huertas was killed offshore in a power boat, his hands tied by handcuffs to a twenty-five-pound weight exercise barbell, part of a weight set (same manufacturer and type) seen in a video tape taken at Gines' property. The video was taped prior to the recuperation of the Huertas corpse. The weight set seen in the video was latter corroborated to be missing a twenty-five pound weight barbell. While codefendant Meléndez was under custody in Seminole County, Florida, Meléndez attempted to hire an inmate named Felipe Milan, about to be released from prison, to kill the government's main witness, Luis Torres. Meléndez revealed to the inmate how Gines killed Huertas, handcuffed him using the twenty-five-pound weight and how the victim Huertas was thrown off the boat into the ocean by Meléndez and Gines. There are, therefore, at least two witnesses who will testify as to the fact that Gines was the triggerman. Although Torres, the other person in the power boat and principal cooperator as to the murder and drug conspiracy failed the polygraph exam as to questions relating to the murder, there is sufficient evidence not related to Luis Torres' testimony to convict Gines on the drug charge (drug seized from the car he was operating; suitcase positive to heroin seized on his residence; confidential source as to drug activities; trips to Colombia, Venezuela, etc.; money laundering evidence described infra).[16]

Further, the polygraph failure of Torres will not necessarily reach the jury. *Devries v. St. Paul Fire and Marine Insurance Co.*, 716 F.2d 939, 944–45 (1st Cir. 1983)(the discretion of the District Court generally "has been exercised to exclude the evidence." *See generally* Annot.) 43 ALR Fed. 68, 78–79 (1978)(Judicial distrust of polygraph test results ... "has resulted in general denial of their admissibility in federal courts up to the present time," cited in *Devries,* 716 F.2d at 944). Even if Gines was not the triggerman, there will be evidence placing him in the boat with Meléndez conspiring in the premeditated murder of Huertas (barbell weight in boat, handcuffs, chains and murder weapon in the power boat). The evidence as to the money laundering activities of Gines is also strong. Three witnesses will testify implicating Gines in money laundering activities including Luis Torres. There are wire transfers in Gines' name, further money laundering evidence on behalf of Gines has been seized from Gines' property, all of which not only serve as evidence to the money laundering count but further enhance the strength of the drug conspiracy charge.

[6] Although the characteristics of the person of Meléndez favor bail, the evidence as to Meléndez is strong as to the conspiracy to murder Huertas in order to further the drug conspiracy. The power boat used was taken from the dock by Meléndez, since the boat belonged to his girlfriend and he was an authorized user. Further, Gines revealed to an inmate

---

**16.** At the time of the search of the car driven by Gines, owned by his wife, wherein 1.4 kilos of heroin was seized by the police, he was accompanied by Colombian national named Andrades, a codefendant in this case. An-

drades was at the time a crew member in a tourist vessel. His cabin was subsequently searched revealing further incriminatory evidence. (Evidence directly related to the drugs found in the car driven by Gines.)

named Ernest Scorpio that it was Meléndez who actually killed Huertas. Meléndez while in custody in Seminole, Florida attempted to retain an inmate named Felipe Milan, to be then soon released from custody, to kill the government's main witness, Luis Torres. Neither Scorpio nor Milan implicate Luis Torres as the triggerman. They had Gines and Meléndez themselves as their respective source. Felipe Milan was revealed by Meléndez while they were both still in Florida, that the potential victim, Luis Torres, was in the past represented in a criminal case by attorney Luis Rivera local counsel also representing Gines in Puerto Rico in this case.[17] The retained triggerman, now cooperator, was also advised as to a dog in the property of Gines, all enhancing the prospective killer's credibility. Meléndez also is a traveler to México, Venezuela, Dominican Republic and St. Martin. (The majority of the drug was moved through the Caribbean and the money laundering was mainly to St. Martin and South America.) The evidence as to money laundering is also strong as to Meléndez, since there are three witnesses testifying as to his money laundering operations and at least two wire transfers are in his name. The money laundering, the participation in the murder of Huertas and the attempt to kill the government's main witness are all strong circumstantial evidence as to the drug conspiracy. Further, the government has evidence of Meléndez' meeting with a drug supply source of Gines. The evidence described above was unchallenged by Meléndez except as to credibility and weight.

Although the District Court of Puerto Rico has seen many cases where the "quondam accomplice" of the principal perpetrators becomes the "key witness",

*United States v. Paniagua Ramos,* 251 F.3d 242 (1st Cir.2001), in the instant case there exists other independent evidence connecting the defendants to all of the charges alleged in the indictment.

Both defendants are facing stiff long sentences on the drug conspiracy standing alone without including the murder charged in the indictment during and in relation to a drug trafficking crime which mandates life imprisonment, 18 U.S.C. § 1111. Both Gines and Meléndez by the travels abroad in South America/Caribbean and the proffered evidence as to their participation in considerable drug smuggling/distribution trigger the congressional concern cited above that drug traffickers have "established ties outside the jurisdiction" and hence are "flight risks." Further, Congress has found that "flight to avoid prosecution is particularly high among persons charged with major drug offenses." *Jessup,* 757 F.2d at 384.

The presumption of "danger to the community" is also present in the instant case since "it is clear [that] the harm to society caused by narcotic trafficking is encompassed within Congress' definition of 'danger.'" *United States v. De Leon,* 766 F.2d 77, 81 (2nd Cir.1985). Moreover, both codefendants are charged with murder during and in relation to a drug trafficking crime and there is evidence of attempts to hire a triggerman to kill the government's principal witness. Both codefendants therefore pose a danger to the community, because the government has evidence as to substantial drug trafficking, and further because they are charged with murder and there is evidence of an attempt to hire a killer to terminate the life of a witness. Hence, if released, Gines and Meléndez pose a danger to the community.[18]

---

17. See sealed document no. 67.

18. Gines is further charged as a felon in possession of a weapon. The proffered evidence

■ Therefore, under the above described factual scenario the standard of proving "flight risk" by a preponderance of the evidence under the mandate of *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir.1991) and of proving "danger" to the community by "clear and convincing evidence," *United States v. Salerno*, 481 U.S. 739, 750, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) has been met as to codefendants Gines and Meléndez. Bail must be **DENIED** as to codefendants Gines and Meléndez because the required factors under the law, 18 U.S.C. § 3142(g), preponderate in favor of detention. (The failed polygraph of Torres as to the murder of Huertas does not rebut the strong case otherwise proffered by the United States.)

### III. BAIL BASED ON DUE PROCESS VIOLATION

Based on the unquestioned fact that codefendant Gines has been under custody since July 6, 1998, and codefendant Meléndez since September 5, 1998, a due process violation is alleged. Defendants state that "it is crucial to note that no appellate court anywhere in the country has ever upheld a pretrial detention of this length against a due process claim." Codefendants submission at the objection to the Magistrate's Report and Recommendation, (Docket No. 339 p. 4). The codefendants over emphasize, in the court's opinion, the criteria of length of the detention. The court explains.

A due process claim based on prolonged detention time must begin with an analysis of the case of *United States v. Salerno, Id.* In *Salerno* a defendant detained for a prolonged period under the Bail Reform Act alleged a due process violation averring that the statute was unconstitutional because the Bail Reform Act provided for pretrial detention solely on the ground

that "no condition or combination will reasonable assure the safety of any other person and the community." 18 U.S.C. § 3142(e). The defendant persuaded the Court of Appeals. *United States v. Salerno*, 794 F.2d 64 (2nd Cir.1986). The Supreme Court reversed and stated that "[a]s an initial matter, the mere fact that a person is detained does not inexorably lead to the conclusion that the government has imposed punishment (citations omitted) ... we conclude that the detention imposed by the act falls on the regulatory side of the dichotomy." *United States v. Salerno*, 481 U.S. at 745, 107 S.Ct. 2095. The court concluded that "the pretrial detention contemplated by the Bail Reform Act is regulatory in nature, and does not constitute punishment before trial in violation of the due process clause." *Salerno* at 747, 107 S.Ct. 2095. The court specifically rejected and reversed the Court of Appeals which had concluded that "the Due Process Clause prohibits pretrial detention on the grounds of danger to the community as a regulatory measure, without regard to the duration." (*Id.* Citations omitted.) The defendant had urged the Supreme Court that the Due Process Clause erected an impenetrable "wall" in the area that "no governmental interest— rational, important, compelling or otherwise—may surmount." Brief of respondent Salerno cited in *Salerno, Id.* (Citations omitted.) The Supreme Court held that "[w]e do not think the clause lays down any such categorical imperative. We have repeatedly held that the government's regulatory interest in community safety can, in appropriate circumstances, outweigh an individual's liberty interest." *Id.* The court specifically reserved "... no view as to the point at which detention in a particular case might become excessively

of a weapon used by Gines substantiates the charge.

prolonged, and therefore punitive, in relation to Congress' regulatory goal." *United States v. Salerno*, 481 U.S. at 747 n. 4, 107 S.Ct. 2095.

There is, therefore, no bright line time limit of detention which constitutes a due process violation. The court must examine the totality of circumstances before determining if the "Government's regulatory goal in community safety can . . . outweigh an individual's liberty interest." *Salerno, Id.* In examining the required factors this court looks for guidance from the First Circuit Court of Appeals and other Circuit Courts that have encountered the issue.

In *United States v. Zannino*, 798 F.2d 544, 546–548 (1st Cir.1986), the court was faced with a due process challenge from a defendant that was incarcerated and dangerous but too physically sick to face trial, ". . . here trial has been delayed because of *Zannino*'s insistence, supported at least so far by the district court's findings from the medical evidence before it, that the cardiac condition renders him physically unfit to stand trial, and that nevertheless this condition has not rendered him nondangerous." In *Zannino* the First Circuit Court of Appeals explicitly refused to follow the opinion of the 2nd Circuit in *United States v. Salerno*, 794 F.2d at 64 finding the Bail Reform Act unconstitutional. As described above the First Circuit Court of Appeals in *Zannino* thus anticipated the decision of the Supreme Court latter set forth in *United States v. Salerno*, 481 U.S. at 739, 107 S.Ct. 2095.

The First Circuit Court set forth in *Zannino* the factors to be followed to determine when due process would require a release from custody. The court followed the criteria set forth in the case of *United States v. Accetturo*, 783 F.2d 382, 383 (3rd Cir.1986).

Because due process is a flexible concept, arbitrary lines should not be drawn regarding precisely when defendants adjudged to be flight risks or dangers to the community should be released pending trial. Instead, we believe that due process judgments should be made on the facts of individual cases, and should reflect the factors relevant in the initial detention decision, such as the seriousness of the charges, the strength of the government's proof that defendant poses a risk of flight or a danger to the community, and the strength of the government's case on the merits. Moreover, these judgments should reflect such additional factors as the length of the detention that has in fact occurred, the complexity of the case, and whether the strategy of one side or the other has added needlessly to that complexity.

The court proceeds to examine the criteria since the ultimate decision "should be made on the facts of "individual cases," but do not exclusively depend on amount of time under custody".

As previously stated, the instant case is a case involving serious charges against both codefendants,—the case involves a drug conspiracy of possession with intent to distribute large quantities of cocaine and heroin. Further, one murder conspiracy is charged as to both codefendants using a weapon in relation to a drug crime; the murder of the government's principal witness has been allegedly attempted; money laundering to camouflage the illegal drug activities is charged as to both defendants. The case against both defendants is strong because it does not depend upon one witness. Drugs have been seized by the authorities from one codefendant, a suitcase of the same codefendant in his residence was found to be positive to heroin; one of the codefendants (Gines) had a prior record and was found to have tested positive to drugs on several occasions; both codefendants traveled frequently to

South America and the Caribbean (Gines traveled on a one-day round trip to Colombia); one cooperator and a confidential source shall testify as to the drug conspiracy; another codefendant accompanying Gines in the car where the drugs were confiscated was the subject of a search in the crew cabin he occupied in a tourist vessel and further incriminating evidence was found (materials relating to the seized drugs from Gines' car); one of the codefendants, Meléndez, participated in the conspiracy to murder (a witness states that he murdered the victim) and also hired a triggerman in furtherance of the conspiracy to kill the government's principal witness. Both codefendants are involved in money laundering according to three witnesses and the United States has in its possession documents of wire transfers in the name of both Gines and Meléndez which further enhance the drug conspiracy case.

Moreover, both codefendants are a flight risk because they are facing long sentences, the case is strong and they are congressionally presumed to have contacts abroad acquired through their trips to South America and the Caribbean. Finally, the defendants are a danger to the community because of the drug conspiracy and the proclivity to violence as evidenced by the murder of a co-conspirator and the hiring of a triggerman to kill the government's main witness.

The court concedes that both codefendants have been under custody since July and September of 1998. Trial can not be held in the case until September/October 2001, because one of the counsel of codefendants, Meléndez, Mr. Jorge Arroyo, is currently in a trial before the undersigned District Judge, *United States v. Lorenzo Muñoz Franco*, Cr. No. 95–386. The trial in the *Lorenzo Muñoz Franco* case is ex-

pected to last until probably August/September 2001.

■ However, the delay in the trial in the instant case is not due to governmental delay conduct but because of the complexity of the case and because counsel for codefendant, Meléndez, Jorge L. Arroyo, has been legitimately extremely busy trying cases in the District of Puerto Rico making him unavailable to try this case since May 1999 until this date. The court explains.

Because the case involved a murder relating to a drug transaction, the United States sought on November 2, 1998 the death penalty in the instant case, (Docket No. 48). The procedure lasted until April 9, 1999, when the United States notified the Death Penalty, (Docket No. 87). No suppression motions, discovery motions, nor motion to dismiss was filed in the period of time while the death penalty matter was determined.

Another protracted procedure began on December 16, 1998 when local counsel Luis Rivera announced that he had a potential conflict of interest because he had represented in the past in another criminal case in federal court, Mr. Luis Torres, who was the government's principal witness as to the murder of a cooperator and one of the witnesses as to the drug conspiracy, (Docket No. 63). The matter was further complicated by a motion filed under seal by the United States, (Docket no. 67), which caused the court to hold in abeyance ruling on the matter since a procedure then being held before the Grand Jury could definitely dispose of the conflict. The defendants themselves further requested the court to defer deciding the issue until after the death penalty matter was determined because "learned" counsel could cross-examine the witness Torres thereby mitigating the potential conflict of interest, (Docket No 77). The court wait-

ed until the determination of the death penalty matter and until the matter of the striking of the death penalty requested by the defense was resolved. The court then held two hearings and held final oral arguments on October 7, 1999, (Docket No. 153). The court also delayed decision pending resolution of the Grand Jury matter as to the conflict of counsel Rivera as stated above. The court decided the disqualification motion on March 28, 2000, (Docket No. 206). The defendants did not suffer prejudice since during said time counsel Jorge L. Arroyo had informed he was unavailable to try the case because of trials in the District and the court had officially requested counsel to advise the court on his availability pursuant to the case of *United States v. Santiago–Becerril,* 130 F.3d at 16. Further, a Motion to Suppress had been filed on April 16, 1999, by the codefendant, hearings were held as to the Motion to Suppress before the Magistrate Judge as late as January 18, 2000, (Docket No. 128), hence codefendants suffered no prejudice by the court deferring a decision on the motion to disqualify counsel Rivera.

The Suppression Motion was decided by the Magistrate Judge adverse to the codefendants on June 20, 2000, (Dockets No. 247, 248). Defendants appealed on July 20, 2000, and before the court could decide the Motion to Suppress, defendants announced on November 16, 2000, that they were to seek a motion to reopen the suppression before the Magistrate Judge, (Docket No. 326).[19] Counsel Arroyo continued unavailable because he was trying the case of *United States v. Flor de María Cacho,* Civil No. 97–145, before the undersigned Judge from April 14, 2000 until August 18, 2000. Further, counsel Arroyo was also counsel in the case of *United States v. Lorenzo Muñoz Franco,* Cr. No. 95–386, originally scheduled to commence on August 28, 2000, and which actually began, because the court granted defendants several continuances at their request, on November 28, 2001.[20]

The instant case has further been delayed because codefendants Gines and Meléndez have filed several motions which could have been filed much earlier in he proceeding. Defendants filed on November 28, 2000, a Motion to Dismiss allegedly multiplicitous money laundering counts and a Motion to Dismiss Count II (murder conspiracy) based on due process, (Dockets No. 312, 313). Both of these motions could have been filed at least after the superseding indictment was issued on May

**19.** The Motion to Reopen the Motion to Suppress was eventually filed on April 4, 2001, (Docket No. 362).

**20.** The court expressly requested counsel Jorge Arroyo on July 19, 1999, to advise the court on his availability to try the instant case, (Docket No. 119), pursuant to the suggestions of the First Circuit Court of Appeals as expressed in *United States v. Santiago–Becerril,* 130 F.3d at 16. Counsel Arroyo since said date has been as corroborated by the cases reflected in this record, at the following trials and hence has never been able to respond to the court:

1. United States v. Israel Cáceres, Criminal No. 95–405(CC) trial from May 12, 1999 until December 14, 1999.

2. United States v. Caraballo González, Criminal No. 96–105(SC) trial from January 27, 2000 until February 17, 2000.

3. United States v. Flor de María Cacho, Criminal No. 97–145(DRD) trial from April 14, 2000 until August 18, 2000.

4. United States v. Lorenzo Muñoz Franco, Criminal No. 95–386(DRD) trial from November 28, 2000 until this writing. Expected to terminate August/September 2001.

There have been no "windows" as set forth in *United States v. Santiago–Becerril,* 130 F.3d at 16, for the court to set trial because at all times there has been pending resolution the disqualification motion or the motion to suppress.

11, 2000. The due process claim to dispose of the murder count could have been filed as early as the date of the original motion to suppress, April 16, 1999, because Count II has not experienced any amendment. Codefendant Meléndez filed also in November 8, 2000, two motions to suppress evidence seized from his home in Orlando, Florida and Guaynabo, P.R., (Dockets No. 293, 294). Said late filing confirms that codefendant Meléndez is not ready for trial until said motions are resolved by the court.

The court further notes that codefendants advised the court on the status conference of August 29, 2000, (Docket No. 272), that they could be ready for trial after the Motion to Suppress was decided. The Motion to Reopen Suppression has not been decided and is currently set for hearing before the Magistrate Judge on June 7, 2001, (Docket No. 382).

Plaintiffs urge the court to adopt the standards set forth in *United States v. El–Hage*, 213 F.3d 74, 79–80, in determining when due process should halt a prolonged incarceration. The standards are similar to that expressed in *Zannino*, 798 F.2d at 544, except that *El–Hage* incorporates the standard of the extent of the responsibility of the prosecution in the delay. The court finds that the delay in the instant case is motivated by the complexity of the case, (death penalty issue, disqualification of counsel and suppression motion) and the unavailability of counsel Jorge L. Arroyo, who has been unquestionably litigating during most of the length of this case other complex long cases before the District Court of Puerto Rico. (See fn. 20, infra.) Counsel for the defense urge that fault lies in the United States because of failure to timely advise the defense the polygraph test results of witness Torres on October 29, 1999. However, counsel for defense overlooks that the original motion to suppress filed on April 16, 1999, (Docket No. 93), was not submitted for resolution to the Magistrate until May 10, 2000, (Docket No. 225) and the decision of the Magistrate Judge was rendered in June 20, 2000, (Docket No. 247). After the Report and Recommendation by the Magistrate Judge the defendants stated they would seek to reopen the motion. The reopener motion was not filed until April 4, 2001, (Docket No. 362). Hence, the alleged failure to notify the polygraph results plays no significant role in the delay of the case even without considering counsel Jorge L. Arroyo's unavailability.

The court following the criteria of *Zannino*, 798 F.2d at 546–47, **DENIES** the bail request as to both codefendants Gines and Meléndez based on due process and based on the Bail Reform Act, 18 U.S.C. § 3142(g).

**IT IS SO ORDERED.**