IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

Respondent,

v.

JEREMY SHAW,

Appellant.

No. 84062-2-I

DIVISION ONE

UNPUBLISHED OPINION

DÍAZ, J. — Appellant Jeremy Shaw was in jail for 41 months awaiting trial. Following the trial, a jury convicted him of murder in the first degree and arson in the second degree. Shaw argues that the delay violated his right to a speedy trial under the Sixth Amendment of the United States constitution and article I, section 22 of the Washington constitution. Shaw also separately challenges the sufficiency of the evidence and raises other rule-based and statutory assignments of error in his statement of additional grounds. We affirm the trial court's judgment and sentence.

I.     FACTS

A.     The Murder of Steven Morphis

Steven Morphis lived alone on a remote property in unincorporated King County. One of two contractors, Matthew Goodrow and Dan Norwood, who had been working on Morphis's property, found him dead in a shed on his property in September 2018. Morphis had suffered multiple blunt force strikes to his head.

His hands were bound tightly with zip ties and his throat had been slashed open. Morphis's credit cards, cell phone, and 2007 Nissan Sentra were missing. The contractors contacted the police.

A few days later, police discovered Morphis's burned-out car in University Place in Pierce County, which was closer to Shaw's Tacoma residence than Morphis's. Surveillance cameras showed that the person who set the vehicle on fire had singed themselves because they were standing too close to the flame.

Pursuant to law enforcement's further investigation, cellular records showed Morphis's missing cell phone had been located near the burned car. Police later found that missing cell phone in Shaw's house, along with Star Trek memorabilia and various collectibles that Morphis owned or kept at his residence. The police also recovered the remnants of Morphis's driver's license, social security card, and bank card from a shredder located on Shaw's property.

Moreover, police recovered Shaw's fingerprints from multiple objects inside Morphis's house, including a heavy flashlight. Further investigation determined Shaw's DNA was on one of the zip ties found attached to Morphis's body.

During Shaw's arrest, the police observed that "the arm hair on his right arm was noticeably singed." He was also wearing a Boeing jacket which Morphis owned, as he had recently retired from Boeing.

Police seized a notebook from Shaw's residence, which contained handwritten research on obtaining title to property through adverse possession. A review of Morphis's bank activity revealed that Morphis's bank card was used to

2

make a purchase on "www.deeds.com.[1]" Police also seized a warranty deed found at Shaw's house, bearing a forged notary stamp, which Morphis ostensibly signed and which purported to transfer Morphis's estate to Shaw in exchange for $10. Finally, Shaw's roofing company made two additional charges to Morphis's credit card, both of which occurred after Morphis was already dead.

B.    Overview of the Pretrial Proceedings

   1. Pre-COVID-19 Pandemic Continuances

The State ultimately charged Shaw with murder in the first degree (count 1) and arson in the second degree (count 2). The State had initially charged his wife as a co-defendant on the non-homicide offenses, and with felony rendering criminal assistance in the first degree. Following his arraignment in October 2018, the trial court initially set the trial for December 2018. Over the next several months, the defense counsel received voluminous discovery materials and moved several times to continue the trial to review that discovery. That was nearly all the discovery the State would provide to the defense until the eve of trial.[2]

By August 2019, the defense represented to the court that it had finished reviewing the discovery and was "probably" in a position to start coordinating

---

[1] WWW.Deeds.com is an online company that assists individuals with real estate needs, including forms, title search, e-recording, deed retrieval and information.

[2] The State provided three types of evidence after this time period. First, the State took more than a year to obtain Morphis's autopsy report, which it provided to the defense upon receipt in January 2020. (As will be discussed below, because the State never fully explained the delay in providing the report, the trial court found that the belated transmittal of the report, among other things, constituted "mismanagement" but was "not prejudicial.") Second, in February 2022, the State advised the court that it had not provided the call detail records from Shaw's cell phone, but that that data did not appear to have had any exculpatory value. Third, one week before the trial, the State provided some medical scans to the defense.

interviews, which Shaw's attorneys asserted was necessary to provide effective assistance of counsel. Defense counsel understood that a large number of the witnesses would request the State's presence, which it forewarned would be difficult to coordinate. On February 28, 2020, in the last hearing before the COVID-19[3] pandemic, the defense notified the court that because of the volume of discovery, they had not started conducting interviews yet.

2. Post-COVID-19 Pandemic Continuances

Over the next 16 months, in subsequent hearings from July 31, 2020, to December 13, 2021, defense counsel repeatedly moved to continue the trial, advising the court that they were making progress on the witness interviews, but had confronted many challenges in scheduling up to 74 witness interviews, including that (a) some interviews would be conducted by zoom (because of the Covid-19 pandemic) but some had to be conducted in-person because of the nature of the discovery; (b) detectives in two counties had indeed requested the State's attorneys to be present at the interviews; and (c) the parties had confronted scheduling limitations on all sides because of the backlog that followed, even as the Covid-19 pandemic subsided, all of which resulted in systemic delays.

3. Shaw's Objections

As early as May 2019, Shaw moved the court to substitute his counsel because of an alleged breakdown in communication and irreconcilable conflict. The court denied his motion, stating the attorneys were competent and

_____

[3] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," a severe, highly contagious respiratory illness that quickly spread throughout the world after being discovered in December 2019.

4

professional, the defense was progressing, and there was a significant amount of work to be done.

From the beginning of the case, in response to each motion to continue, whether from his own counsel or as agreed to by the parties, Shaw repeatedly asserted his right to a speedy trial and vociferously objected to continuances.

C.    Trial and Sentencing

The trial began on March 9, 2022.  Shaw moved to dismiss the charges or exclude evidence under CrR 4.7, CrR 8.3(b), and CrR 3.3.  Shaw claimed that the State had "mismanaged this case by . . . delaying provision of discovery to the defense," "failing to provide a witness list . . . until January 13, 2020," and "facilitat[ing] no witness interviews . . . until the Spring of 2020."  The court denied the motion, finding the State did not mismanage the interviews and noting the "profound disturbance" the COVID-19 pandemic caused.

The jury convicted Shaw of murder in the first degree and arson in the second degree.  At sentencing on May 13, 2022, Shaw did not stipulate to any prior convictions or the State's proposed offender scores.  The court reviewed the certified copies of each conviction and found Shaw had an offender score of 12, which is outside the highest range (of 9).  The court sentenced him to 548 months, which was at the top of, but within, the standard sentencing range.

Shaw timely appeals.

## II.    ANALYSIS

### A. Right to a Speedy Trial

#### 1. Law

The Sixth Amendment, as well as article I, section 22, guarantees the right to a speedy trial. State v. Shemesh, 187 Wn. App. 136, 144, 347 P.3d 1096 (2015). These provisions provide coextensive protection in this context, obviating the need for a separate analysis of each. State v. Iniguez, 167 Wn.2d 273, 289-90, 217 P.3d 768 (2009).

This court's review of a claim of a violation of the right to a speedy trial is de novo. State v. Ollivier, 178 Wn.2d 813, 826, 312 P.3d 1 (2013). Reviewing courts undertake a two-part inquiry. Iniguez, 167 Wn.2d at 283-84. First, the court determines whether "the length of the delay crossed a line from ordinary to presumptively prejudicial." Id. If such a line was crossed, courts then apply the non-exclusive, four-factor balancing test to determine if a constitutional violation occurred. Id. The balancing test contains four factors: (1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of their right, and (4) prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

The Barker analysis is "fact-specific" and necessarily depends on the particular circumstances of the case. Ollivier, 178 Wn.2d at 827. The analysis requires the reviewing court to weigh the conduct of both the prosecution and the defense in bringing about the delay. Id.

None of the four factors identified above is either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Barker, 407 U.S. at 533. The court's balancing process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the constitution. Id.

2. Discussion

As to the first step of the two-part inquiry, while dependent upon the nature of the charges, lower courts have "in general found presumptively prejudicial delay at least at the point at which it approaches one year." Ollivier, 178 Wn.2d at 828. In its briefing and at oral argument, the State assumes and concedes, respectively, that the 41-month delay was presumptively prejudicial. Wash. Ct. of Appeals oral argument, State v. Shaw, No. 84062-2-I (July 21, 2023), at 10 min., 34 sec., through 11 min., 2 sec., video recording by TVW, Washington State's Public Affairs Network,https://tvw.org/video/division-1-court-of-appeals-2023071136/ ?eventID=2023071136. We accept the State's concession, without independently finding, that the 41-month delay is presumptively prejudicial. See, e.g., Ollivier, 178 Wn.2d at 828 (agreeing without conducting the analysis). "This does not mean that the right to a speedy trial has been violated but rather that the [] delay is sufficient to trigger the *Barker* analysis." Id. And, as in Ollivier, Shaw "has limited his arguments to these factors" and we recognize that "although we generally examine each in order, they are interrelated." Id.

a. The length of delay

As to the first factor, the "length of delay," this court had held that "[t]he

7

constitutional right to a speedy trial is not measured by a fixed time period." State v. Ross, 8 Wn. App. 2d 928, 943, 441 P.3d 1254 (2019). And as an initial matter, our Supreme Court has noted that "in numerous cases[,] courts have not regarded delay as exceptionally long where the delay was as long as or longer than here, particularly when the delay was attributable to the defense." Ollivier, 178 Wn.2d at 828-29 (citing, inter alia, United States v. Lane, 561 F.2d 1075 (2d Cir. 1977) (58 months, much attributable to repeated requests by the defense for continuances); United States v. Porchay, 651 F.3d 930, 940 (8th Cir. 2011) (although the court assumed a 39–month delay was presumptively prejudicial, there was no sixth amendment violation in part because "much of the delay . . . was attributable to [defendant's] own actions")); see also United States v. Muhtorov, 20 F.4th 558, 659-60 (10th Cir. 2021) (no violation from a six-and-a-half year delay); United States v. Casas, 425 F.3d 23, 34 (1st Cir. 2005) (Forty-one month delay); United States v. Scully, 951 F.3d 656, 669 (5th Cir. 2020) (five -year delay)).

More substantively, without conflating this factor with the second factor, we consider whether the length of the delay is "highly disproportionate to the complexity of the issues and counsel's need for preparation." Ollivier, 178 Wn.2d at 830.

Shaw contends that, despite the seriousness of the charges, such a delay was not necessary or inevitable because he did not change counsel, the defense did not request expert testimony or engage in complicated pretrial litigation, and the defense only filed a handful of motions the week before the trial.

The State asserts that this was a complex case involving serious charges, voluminous amounts of discovery, involving serious charges, multiple scenes, dozens of witnesses, several varieties of forensic evidence, and coordination between two defense teams. The State further notes that the COVID-19 pandemic exacerbated the situation as the majority of the pre-trial delay in this case – approximately 24 months – coincided with the COVID-19 pandemic.

We agree with the State. As in Ollivier, the trial court expressly acknowledged that this case was "complex." 178 Wn.2d at 829.

- This case involves murder in the first degree.

- The discovery was repeatedly described as voluminous. That discovery included a large variety of different types of forensic evidence: fingerprints, DNA, cell phone data, reconstruction, and surveillance footage, medical reports, bank records, and more.

- The witness list, provided as early as January 13, 2020, identified 74 persons the State may call. In a joint motion for one continuance, counsel for Shaw and counsel for Shaw's wife stated their defense investigation was a "substantial investigation."

- Finally, this voluminous discovery and these numerous witnesses were spread out over multiple crime scenes in two different counties requiring scores of search warrants.

As the State points out, "In our superior courts typically [we] don't get much more complicated than this." Wash. Ct. of Appeals oral argument, supra at 11 min., 37 sec., through 11 min., 44 sec.

Even before the COVID-19 pandemic, the defense counsel had warned the court on August 23, 2019, that, considering the defense's caseload and the magnitude of investigation and interviews, a realistic but pessimistic date to try this case would be another 12 months from then.

Moreover, as the aforementioned joint motion showed, Shaw's counsel was coordinating with the co-defendant, who was Shaw's wife (certainly adding a unique complexity to that coordination), who herself substituted counsel in mid-2020. And contrary to Shaw's representation, while no experts were ultimately retained, some time was spent considering whether to retain an expert.

For many of these reasons, the defense conceded at oral argument that the case was complex. Wash. Ct. of Appeals oral argument, <u>supra</u> at 3 min., 50 sec., through 3 min., 59 sec. We look skeptically at Shaw's attempt to now minimize the complexity of this case involving a murder in the first degree.

Most importantly, the defense counsel spent more than two years finishing their own witness interviews, even after a "very good" prosecutor was assigned to the case. We will discuss below why it took so long to complete those interviews, but for now, it is clear that, during this period, it was the defense counsel who sought "nearly all of the continuances" to complete those interviews and "so that defense counsel could be prepared to defend" Shaw in this matter. <u>Ollivier</u>, 178 Wn.2d at 831. "This is an extremely important aspect of the balancing and leads us to conclude that the length of delay was reasonably necessary for defense preparation and weighs against the defendant." <u>Id</u>.

  b. The reason for the delay

As to the second factor, the "reason for the delay," our Supreme Court has held that "'pretrial delay is often both inevitable and wholly justifiable.'" <u>Id.</u> at 831 (quoting <u>Doggett v. United States</u>, 505 U.S. 647, 656, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992)). "When the delay is due to trial preparation needs, as in this case,

the first and second factors are closely related," as we have seen. Id. Importantly, "[t]he reason for the delay is 'the focal inquiry.'" Id. (quoting United States v. Santiago–Becerril, 130 F.3d 11, 22 (1st Cir. 1997)).

Specifically, a "careful assessment of the reasons for the delay is necessary to sort the legitimate or neutral reasons for delay from improper reasons. A court looks to each party's responsibility for the delay, and different weights are assigned to delay, primarily related to blameworthiness and the impact of the delay on defendant's right to a fair trial." Id.

Furthermore, when "the defendant requests or agrees to the delay," the defendant "'is deemed to have waived [their] speedy trial rights as long as the waiver is knowingly and voluntary.'" Id. (quoting Iniguez, 167 Wn.2d at 284). In other words, "[d]elay caused by defense counsel is chargeable to the defendant." Id. at 832.[4]

Shaw claims the State failed to comply with its CrR 4.7(a) discovery obligations and mismanaged the case by (1) providing the defense with the autopsy report late and (2) then delivering its witness list late and only after being ordered to do so. These two complaints are the only two delays Shaw attributes to the State.

---

[4] On the other hand, when the government deliberately delays the trial to frustrate the defense, this conduct will be weighted heavily against the State. Ollivier, 178 Wn.2d at 832. Delay because of institutional causes, such as overcrowded courts, is still weighted against the government but to a lesser extent. Id. If the government has a valid reason for the delay, then the valid reason may justify a reasonable delay. Id. The delay caused by governmental negligence is more neutral and weighs less heavily than acts of bad faith. United States v. Oliva, 909 F.3d 1292, 1301 (11th Cir. 2018).

Indeed, it took the State more than one year from arraignment in October 2018 to provide the defense with the autopsy report in January 2020. Similarly, though the court ordered the State to deliver the witness list by December 16, 2019, the State provided that list to defense counsel almost one month later on January 13, 2020.

But no evidence exists that those delays caused any further delays. Tellingly, at a hearing in February 2020, the defense notified the court that because of the volume of discovery – rather than the autopsy report or witness list – they had not started interviews yet. The defense did mention that they were not sure how productive some of the interviews could be until they got the autopsy report. It is unclear why, though, the autopsy report was required to begin some interviews because the physical cause of Morphis's death was clear and additional details about how he died did not prevent at least some interviews from starting. Finally, had the defense been ready to begin interviews, most of the witnesses were readily identifiable from the discovery materials provided shortly after arraignment. Shaw has not demonstrated how the delayed disclosure of the report and list hobbled his defense.

Recognizing these facts, Shaw argued at oral argument that the State is blameworthy for its general "foot-dragging," which required defense counsel to "babysit the prosecutor." Wash. Ct. of Appeals oral argument, supra at 4 min., 38 sec., through 5 min., 3 sec. Even if this were true, this accusation is far from a "deliberate delay[]" of the trial to "frustrate the defense." Ollivier, 178 Wn.2d at 832. On the contrary, there is no allegation of deliberate delay or that any State

agent acted in bad faith. The State provided both the autopsy report and the witness list to the defendant two years before the trial. The State assigned a "very good" prosecutor to the case in February 2020, again over two years before Shaw's trial. None of these facts compel us to weigh this factor heavily against the State.

Those thin complaints against the State distract from the primary causes of the delay: (a) the defense counsel's need to conduct interviews and (b) the COVID-19 pandemic.

As to the former, the interviews took an extraordinary amount of time to complete, not just because of the sheer number (as mentioned below), but because of the complexity of the interviews, including (i) the need to review discovery with witnesses, sometimes via electronic means and (ii) the need and difficulty in coordinating those interviews with several different stakeholders, who each had their own limitations, including pre-planned vacations.

As to the latter, as the court acknowledged, there is no dispute that the Covid-19 pandemic delayed the trial in multiple ways. First, as it has been well documented, there was a rise in serious crime, which resulted (as defense counsel noted) in an "onslaught" of new cases. Second, after a backlog was created, the courts hurried to start trials again because as the court noted "[w]e weren't doing trials during that pandemic." In real-time, the defense counsel acknowledged systemic delays the COVID-19 pandemic created, stating that trying to find a "chunk of time" in that environment was difficult, meaning they had multiple

complex cases go to trial during the same time period (as the worst of the Covid-19 pandemic passed), resulting in significant scheduling difficulties.

Thus, either the reasons for delay are chargeable to the defense or they are chargeable to no one as (hopefully) one-time acts of nature. As in Ollivier, "[n]early all of the continuances in this case were sought to accommodate defense counsel's need to prepare for trial. Moreover, while it is true that the defendant objected to most of these continuances, it does not follow that granting them violated [the defendant's] right to a speedy trial." 178 Wn.2d at 834.

Shaw finally also contends the delay resulting from a systemic "breakdown in the public defender system" may be charged to the State. We are not unsympathetic to the burden the defense was laboring under even before the COVID-19 pandemic. Indeed, even pre-pandemic, months after the defense purportedly finished reviewing discovery, they still had not been able to conduct a single interview allegedly because of their caseload.[5] However, though the defense counsel complained several times that they were overburdened, there is no record before us of how the County's Department of Public Defense (DPD) was functioning during this period.

What constitutes a "systemic breakdown" may not be not well-defined in Washington law, so we again may look to federal cases. A federal district court recently found a systemic breakdown when a public defense agency neglected to

---

[5] Specifically, in a hearing in August 2019, the defense attorney notified the court their investigator "has reviewed all of the discovery." In a hearing in November 2019, the defense attorney stated they had not interviewed anybody because of insufficient time to handle trial schedules, new cases, and witness interviews on multiple cases all at the same time.

14

assign the defendant a lawyer for over a year. Russell v. Denmark, 528 F. Supp. 3d 482, 498 (S.D. Miss. 2021). Other courts have suggested a systematic breakdown might occur when it has unreasonable resource constraints. People v. DeCasas, 54 Cal. App. 5th 785, 809, 268 Cal. Rptr 3d 663 (2020).

Here, the fact that Shaw was assigned two defense counsel, whom the court described as "competent [and] professional," suggests the DPD was able to deploy adequate resources in support of Shaw's defense. And after that motion to substitute counsel, Shaw did not complain about his attorneys' performance and he did not raise a Sixth Amendment claim at trial, nor here. The record reflects that his counsel were very busy but does not support a finding of systemic breakdown. People v. Williams, 58 Cal. 4th 197, 249, 315 P.3d 1 (2013).

In summary, this factor weighs heavily against Shaw.

c. The defendant's assertion of his right

As to the third factor, the "defendant's assertion of his right," it is true that Shaw repeatedly asserted his right to a speedy trial and vociferously objected to continuances but it was almost always in response to his own attorneys' motions. To put a finer point on it, there were 16 motions to continue, 15 of which were solicited by the defense (3 of which the State joined). The State's one requested continuance delayed Shaw's trial by a single week. Thus, since nearly all of the continuances sought were, again, for the defense counsel to prepare for trial, this factor weighs against Shaw or at best is neutral. Ollivier, 178 Wn.2d at 839-40.[6]

---

[6] Also, had the trial court denied his counsel's requests for continuances that were needed to prepare for trial, then the defendant might then have had a strong claim that the right to effective assistance of counsel had been denied. Id. at 839.

This conclusion is particularly appropriate here because Shaw objected to even the earliest continuances when counsel could not have been remotely ready. As in Ollivier, "under the circumstances, these objections do not weigh in favor of the conclusion that constitutional speedy trial violations occurred." Ollivier, 178 Wn.2d at 838. A "contrary conclusion would encourage objections even if defense counsel is pursuing a legitimate defense and the continuances are unquestionably requested for this purpose." Id. at 839. Thus, on balance, we weigh this factor against Shaw or as a neutral factor.

> d. The prejudice to the defendant

As to the fourth factor, the "prejudice to the defendant," deprivation of the right to a speedy trial "does not per se prejudice the accused's ability to defend himself." Barker, 407 U.S. at 521. Defendants ordinarily must establish *actual* prejudice before courts will find a constitutional violation. Ollivier, 178 Wn.2d at 840 (emphasis added).

Prejudice to the defendant as a result of delay may consist of (1) oppressive pretrial incarceration; (2) anxiety and concern of the accused; and (3) the possibility that the accused's defense will be impaired by dimming memories and loss of exculpatory evidence. Id. "[A] defendant *must* offer these or other particularized showings of prejudice when the delay is not because of bad faith on the government's part and the delay is not sufficiently long for a presumption of prejudice to arise." Id. The former has not been alleged and the latter is "to be distinguished from the threshold presumption of prejudice that triggers the Barker analysis." Id. at 840 n.10.

Shaw first asserts he spent three and a half years incarcerated and awaiting trial with all of the accompanying disadvantages identified in Barker. At oral argument, Shaw further argued that the conditions of incarceration during the Covid-19 pandemic were "incredibly oppressive under Barker." Wash. Ct. of Appeals oral argument, supra at 8 min., 45 sec., through 9 min., 21 sec.

Our Supreme Court has recognized that the conditions of confinement including the risk of a COVID-19 outbreak were undeniably high in jails. Colvin v. Inslee, 195 Wn. 2d 879, 900, 467 P.3d 953 (2020). As certainly unpleasant as it was, incarceration is considered "oppressive," however, only if the custodial environment was harsher than that experienced by a typical inmate. Shemesh, 187 Wn. App. at 147. No evidence exists that Shaw was held under conditions any different than any other inmate during the Covid-19 pandemic.

Shaw next claims his anxiety is apparent from his frequent correspondence with the trial court and his frequent assertions of his fervent desire to have his day in court. But undue anxiety is generally immaterial unless the defendant can demonstrate a "special harm which distinguishes [their] case from that of any other arrestee awaiting trial." United States v. Dirden, 38 F.3d 1131, 1138 (10th Cir. 1994); Ollivier, 178 Wn.2d at 845. There is no evidence in the record that Shaw suffered constitutionally significant anxiety. "Vague allegations of anxiety are insufficient to state a cognizable claim." Hakeem v. Beyer, 990 F.2d 750, 762 (3rd Cir. 1993).

Shaw finally asserts his defense was impaired by dimming memories and loss of exculpatory evidence. Specifically, he points to the testimony of the

contractors, Daniel Norwood and Matthew Goodrow, who occasionally testified that they were unable to remember certain details of the day they discovered Morphis's body.

On its face, this is a serious allegation because a defendant's inability to adequately prepare their case "'skews the fairness of the entire system.'" Ross, 8 Wn. App. 2d at 955 (quoting Barker, 407 U.S. at 532). But the fatal flaw in Shaw's argument is that he has not identified any particular piece of evidence he believes was materially exculpatory which he could not present at trial. United States v. Grimmond, 137 F.3d 823, 830 (4th Cir. 1998). Faded memories are ultimately irrelevant if they were "in no way significant to the outcome." Barker, 407 U.S. at 534.

Here, it is unclear what Shaw's defense would have gained if either of the contractors had been able to go into more gruesome detail about the body on the day they discovered it. While it is true that Goodrow did state that his memory was generally "[n]ot good," the type of facts he was unable to remember was far from exculpatory. For example, he was unable to recall which day of the week he found Morphis's body, or who had originally introduced him to Norwood. As for Norwood, he testified that he "[didn't] remember little details," such as the specific brand of pain medication that he had been prescribed for an injury he suffered contemporaneous to Morphis's murder, and the material he used to construct the roof on Morphis's shed. The loss of these memories does not rise to actual prejudice.

Thus, this factor weighs against Shaw too.

Weighing the four non-exclusive factors together, we conclude that Shaw's constitutional right to a speedy trial was not violated.

B. Statement of Additional Grounds

In addition to his attorney's briefing on appeal, Shaw submitted a statement of additional grounds (SAG).

1. Background on SAGs

Statements of additional grounds are permitted by RAP 10.10. They serve to ensure that an appellant can raise issues in their criminal appeal that may have been overlooked by their attorney. Recognizing the practical limitations many incarcerated individuals face when preparing their own legal documents, RAP 10.10(c) does not require that the statement be supported by reference to the record or citation to authorities. But it does require that the appellant adequately "inform the court of the nature and occurrence of alleged errors." RAP 10.10(c). It also relieves the court of any independent obligation to search the record in support of the appellant's claims, making it prudent for the appellant to support their argument through reference to facts. RAP 10.10(c). To enable that factual support, it provides the means for appellants to obtain copies of the record from counsel. RAP 10.10(e).

2. Discussion

Many of the facts necessary to address Shaw's first three additional grounds (CrR 3.3, CrR 4.7, CrR 8.3(b)) have generally been addressed above. Shaw also claims that the evidence was insufficient to convict him because forensic evidence suggested other parties were involved or responsible for the

19

crime. Shaw finally claims his offender scores were miscalculated because of the recent ruling of State v. Blake, 197 Wn. 2d 170, 481 P.3d 521 (2021). We will address each in turn.

        a. CrR 3.3

Shaw maintains the 41-month pretrial delay violated his time to trial right under CrR 3.3(b)(1)(i). "The purpose underlying CrR 3.3 is to protect a defendant's constitutional right to a speedy trial." State v. Kenyon, 167 Wn.2d 130, 136, 216 P.3d 1024 (2009).

Application of a court rule to particular facts is reviewed de novo. State v. Kindsvogel, 149 Wn.2d 477, 480, 69 P.3d 870 (2003). Court rules are interpreted similarly to statutes. State v. Thomas, 146 Wn. App. 568, 572, 191 P.3d 913 (2008). The court initially looks at the plain language of the rule and construes the rule according to the drafter's intent. Gourley v. Gourley, 158 Wn.2d 460, 466, 145 P.3d 1185 (2006). If the rule's meaning is unambiguous, the court looks no further. Thomas, 146 Wn. App. at 572 (citing Spokane County v. Specialty Auto & Truck Painting, Inc., 153 Wn.2d 238, 249, 103 P.3d 792 (2004)).

In terms of the sanction for any violation of these rules, CrR 3.3(h) states that "[n]o case shall be dismissed for time-to-trial reasons except as expressly required by this rule, a statute, or the state or federal constitution." CrR 3.3(h); see also State v. Rookhuyzen, 148 Wn. App. 394, 398, 200 P.3d 258 (2009) ("The rule prohibits any dismissals for time-for-trial reasons unless expressly required by a rule, statute, or violation of a defendant's constitutional speedy trial rights.").

Turning to the rule in question, CrR 3.3(b)(1) states that a "defendant who is detained in jail shall be brought to trial within the longer of (i) 60 days after the commencement date specified in this rule, or (ii) the time specified under subsection (b)(5)." CrR 3.3(b)(5) states that if "any period of time is excluded pursuant to section (e), the allowable time for trial shall not expire earlier than 30 days after the end of that excluded period." CrR 3.3(e) states that the "following periods shall be excluded in computing the time for trial: . . . [d]elay granted by the court pursuant to section (f)." CrR 3.3(f)(2) states that "[c]ontinuances or other delays may be granted . . . when such continuance is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." It further goes on to state that "[t]he bringing of such motion by or on behalf of any party waives that party's objection to the requested delay." CrR 3.3(f)(2).

As reviewed above, the defense at least in part brought 15 of the 16 continuances that accounted for the delay, and the one that the State brought on its own motion alone was for one day, hardly affecting speedy trial. Thus CrR 3.3 was not violated.

b. CrR 4.7

Shaw contends late disclosure of discovery violated the rules of discovery under CrR 4.7. In addition to the late delivery of forensic reports and witness list that have been resolved above, Shaw claims that there may have been documents in a six-terabyte hard drive that could have proven a pre-existing business relationship between Morphis and Shaw, which would have explained the financial

documents seized at his house, but which were not provided to the defense until three weeks before the trial.

This is speculative. The defense counsel spent the weekend before trial reviewing the information on the drive and did not address the content of the six-terabyte drive in the defense's subsequent motion to dismiss.

Shaw also claims the late disclosure of "Major Accident Response and Reconstruction" (MARR) scans and cell phone tracking data prejudiced him. But the State had made it clear that it did not intend to introduce any evidence that it belatedly disclosed. The trial court also ruled that the State would need to provide the defense with the opportunity to interview or depose two court days before any illustrative exhibit related to the mapping of the victim's cell phone data was offered to the court. Therefore, no evidence suggests any actual prejudice caused by the late delivery.

### c. CrR 8.3(b)

Shaw asserts that the State's mismanagement of the case violated CrR 8.3(b), which permits a court, after notice and hearing, to "dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." Specifically, he challenges the trial court's decision that mismanagement of the State's discovery obligations did occur, but it did not warrant dismissal.

We review a trial court's ruling on a CrRLJ 8.3(b) motion for an abuse of discretion. State v. Salgado-Mendoza, 189 Wn.2d 420, 427, 403 P.3d 45 (2017).

A court abuses its discretion when an "'order is manifestly unreasonable or based on untenable grounds.'" Id. (quoting In re Pers. Restraint of Rhome, 172 Wn.2d 654, 668, 260 P.3d 874 (2011)).

Under the rule, the party seeking relief bears the burden of showing misconduct and actual prejudice. Salgado-Mendoza, 189 Wn. 2d at 427. Prejudice is not just expense, inconvenience, or additional delay, but must interfere with the defendant's ability to present their case. City of Kent v. Sandhu, 159 Wn. App. 836, 841, 247 P.3d 454 (2011).

"Two things must be shown before a court can require dismissal of charges under CrR 8.3(b). First, a defendant must show arbitrary action or governmental misconduct." State v. Michielli, 132 Wn.2d 229, 239-40, 937 P.2d 587 (1997) (citing State v. Blackwell, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993). Governmental misconduct, however, "'need not be of an evil or dishonest nature; simple mismanagement is sufficient.'" Michielli, 132 Wn.2d at 239-40 (quoting Blackwell, 120 Wn.2d at 845).

Second, the defendant must show prejudice affecting their right to a fair trial. CrR 8.3(b). "Such prejudice includes the right to a speedy trial and the 'right to be represented by counsel who has had sufficient opportunity to adequately prepare a material part of [their] defense.'" Michielli, 132 Wn.2d at 240 (quoting State v. Price, 94 Wn.2d 810, 814, 620 P.2d 994 (1980)).

Shaw brought an CrR 8.3(b) motion, which was heard shortly before trial, and in which he alleged a number of discovery violations, some of which have been discussed above: the difficulty of scheduling interviews, late delivery of the

autopsy report, the loss of some DNA samples, and the late disclosure of cell phone data mapping.

The court did not find the difficulties in scheduling the interviews attributable to the State as mismanagement, noting the difficulties arose from the COVID-19 pandemic and the defense's caseload. The court stated that the late delivery of the autopsy report and the loss of some DNA samples were "mismanagement of a degree that should not be the standard of practice,"[7] but neither were prejudicial to the defense particularly because the defense did not request comparison tests. As to the loss of some DNA samples, the court ordered that the defense may use the DNA data from other sources and the prosecution may not do the same. Finally, as to the cell phone data mapping, the court did not find prejudice because the defense had the raw data. Additionally, the court ordered that the State would need to provide the defense with the opportunity to interview or depose the relevant witness at least two court days before any illustrative exhibit related to the mapping of the victim's cell phone data was offered to the court. In short, the trial court sought to minimize or entirely mitigate any prejudice arising from any suboptimal discovery practice.

Based on these accommodations, we hold that the court did not abuse its discretion because the court's order was not manifestly unreasonable or based on untenable grounds. Salgado-Mendoza, 189 Wn.2d at 427.

Thus, Shaw did not establish prejudice under CrR 8.3(b).

---

[7] At oral argument, the State agreed that the late delivery of autopsy report was suboptimal. Wash. Ct. of Appeals oral argument, supra at 12 min., 57 sec., through 13 min., 8 sec.

d. Sufficiency of the Evidence

Shaw claims that there was insufficient evidence to convict him of either crime, in part because the forensic evidence was inconclusive.

"Evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the State, it allows any rational trier of fact to find all of the elements of the crime charged beyond a reasonable doubt." State v. DeVries, 149 Wn.2d 842, 849, 72 P.3d 748 (2003). A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences that can reasonably be drawn from it. Id. In the light most favorable to the State's evidence, a rational jury could find this evidence sufficient to support both convictions. Id.

An abundance of evidence exists that Shaw committed the crimes. Police recovered Shaw's fingerprints from multiple objects inside Morphis's house. Shaw's DNA was also identified on one of the zip ties found attached to Morphis's body. Cellular records showed Morphis's missing cell phone had been located near Morphis's missing car and later was found in Shaw's house, along with Star Trek memorabilia and various collectibles that Morphis owned and kept at his residence. The remnants of Morphis's driver's license, social security card, and bank card were recovered from a shredder located on Shaw's property. At the time Shaw was arrested, he was wearing a Boeing jacket Morphis owned, as he had recently retired from Boeing. In short, in the light most favorable to the State, a rational jury could find this evidence more than sufficient to support the conviction. DeVries, 149 Wn.2d at 849.

e. Offender Scores

Shaw claims that the State miscalculated his offender score by including a 2006 conviction for unlawful possession of a firearm in the second degree from Pierce County. Shaw states that this firearms charge was a "secondary" charge "resulting from a VUSCA [(the Violation of the Uniform Controlled Substances Act, chapter 69.50 RCW)] with the same cause number and was part of a plea agreement," making the two charges "indivisible." In turn, Shaw claims that, if the firearm charge were vacated under Blake, 197 Wn. 2d at 195, then the rest of his prior convictions could be washed out (except one in 2011), which would materially lower his offender score and standard range.

Based on Shaw's order of judgment and sentence, it appears the crime he seeks to vacate is "unlawful possess firearm 2," to which the public court record shows he pleaded guilty on August 2, 2006, along with unlawful possession of a controlled substance. State v. Shaw, No. 06-1-00795-8 (Pierce County Super. Ct., Wash.).[8]

We hold that the trial court did not err in including that conviction when calculating his offender score.

First, Shaw provides no authority for the propositions either that the VUCSA conviction was "primary" and his firearms conviction "secondary" or that the

---

[8] We may consider this document under our rules of appellate procedure and our evidentiary rules. RAP 10.1(h); see also ER 201(b). As to the latter, this is so because "[t]he court 'may take judicial notice of public documents if their authenticity cannot be reasonably disputed.'" Wash. State Human Rights Comm'n v. Hous. Auth. of City of Seattle, 21 Wn. App. 2d 978, 983, 509 P.3d 319 (2022) (quoting Rodriguez v. Loudeye Corp., 144 Wn. App. 709, 725-726, 189 P.3d 168 (2008)).

convictions were "indivisible." "'Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.'" City of Seattle v. Levesque, 12 Wn. App. 2d 687, 697, 460 P.3d 205 (2020) (quoting DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).

Second, while the VUCSA conviction may be voidable under Blake, doing so will not change Shaw's sentencing range for this crime. This is so because the trial court did not include the VUCSA conviction in Shaw's offender score in the first place. Also, even if the court had included the VUCSA conviction and it was thus appropriate to strike that conviction, his score was 12 on both counts, well over the highest range (of nine). Any revision of his offender score under Blake will have no effect on his standard range here.

### III.    CONCLUSION

We affirm the trial court's judgment and sentence.


Díaz, J.

WE CONCUR:

Coburn, J.                    Mann, J.